FILED - USDC -NH
2023 AUG 11 PM3:26

# THE UNITED STATES DISTRICT COURT
## OF NEW HAMPSHIRE

August 11, 2023

**Lisa M. Brady**, Pro se'
  *Plaintiff*
  v.

Mosca, Jeni; MacDonald, Pamela; Hilliard, Dana; Kincaid, Jeanne; Somersworth School Board; Barry, Virginia; Farrell, Richard; NEA-New Hampshire; Habib, Daniel; Schuh, Mary; McSheehan, Michael

COMPLAINT FOR DECLARATORY. INJUNCTIVE, AND MONETARY RELIEF CIVIL RIGHTS ACTION (42 U.S.C. § 1983) (JURY TRIAL

## VERIFIED COMPLAINT

### BASIS FOR COMPLAINT

1. Lisa Brady proceeds pro se' with this action against the above stated defendants, brought under 42 U.S.C. § 1983 for declaratory and injunctive relief, compensatory and punitive damages. All defendants acted under color of state law, and conspired to deprive Brady of federally secured rights under the First and Fourteenth Amendments to the U.S. Constitution.  Their persistent and vengeful retaliatory acts were meant to silence Brady from reporting her former student's false light exploitation in a public grant funded film, "Axel," and to deprive her of justice.

2. The New Hampshire State Defendants acted to prevent a legitimate news story from revealing the truth about the exploitation of Axel, at the hands of teachers, administrators, and U.N.H. Institute on Disability staff.  Lisa Brady, was egregiously terminated from the Somersworth School District, and robbed of her teaching career in January of 2015, after she blew the whistle.

1

**3.** "He who pays the *piper calls* the tune." Lisa Brady did *not have one exchange of*

*discovery* in New Hampshire Courts.  The State of New Hampshire; its' school

officials and judicial officers turned a blind eye to holding anyone accountable

for the fraudulent use of New Hampshire State and Federal grant funds; and the

false light portrayal of "Axel."

*"We emphatically agree with the circuit court that there can be no doubt that alleged child abuse in a public school's special education classroom is a matter of grave public concern. What was recorded in A.P.'s classroom goes to the heart of our society's need for transparency in its public education system. Thus, the speech at issue clearly and unequivocally related to a matter of public concern." 866 SE 2d 156 - W Va: Supreme Court of Appeals 2021. See Yurish v. Sinclair Broadcast Group, Inc.*

### PARTIES

4.  **Jeni Mosca** is being sued in her Individual capacity, at all relevant times related to her actions, she acted as Superintendent at *SAU 56* (*Somersworth*, Rollinsford N.H.). She acted under color of state law and conspired to cause a deprivation of Lisa Brady's federal rights under the First and Fourteenth Amendment to the Constitution. She retired from Somersworth in 2017. Jeni Mosca worked at SAU#56 at 51 West High Street, Somersworth, NH 03870 during the time of violations, and currently resides at 18 Thornhill Road, Stratham, NH 03885. Phone# 603-926-1205.

5.  **Pamela MacDonald** is being sued in her individual capacity; she acted as Director of Special Education at *SAU 56* (*Somersworth*, & Rollinsford N.H.) at all times relative to her actions. She acted under color of state law and conspired to cause a deprivation of Lisa Brady's federal rights under the First and Fourteenth Amendment to the Constitution. She no longer works for Somersworth S.D., and currently an associate Director of Special Education for SAU#72 at 252 Suncook Valley Rd Alton, NH,03809.  Pam MacDonald worked at SAU#56 at 51 West High Street, Somersworth, NH 03870 during the time of the violations. She currently resides at 33 Dewey St., Rochester, NH 03867. Phone#603-237-5264.

6.  **Dana Hilliard** is being sued in his professional and Individual capacities as an *administrator for the Somersworth School District and as Mayor for the City of Somersworth.* He is being sued in his professional and Individual capacities as a school administrator, and in his personal capacity as the mayor. He acted under color of state law, and conspired to cause a deprivation of Lisa Brady's federal constitutional rights under the First and

Fourteenth Amendments. Dana is currently the Director of School District Operations for the Somersworth School District, SAU 56. **Dana Hilliard** is also the current Mayor for the City of Somersworth. His SAU 56 address is: 51 West High Street, Somersworth, NH  03878, phone 603-692-4450. His address as mayor is One Government Way Somersworth, NH 03878, 603-841-5720. His home address is listed as 11 Chabot St., Somersworth, NH  03878 Phone # [603-692-4450].   \*\*The United States Supreme Court held that a city is a person for purposes of Section 1983. See <u>Monell v. Department of Social Services</u>, 365 U.S. 167, 81 S. Ct. 473 (1961).

7. **Jeanne Kincaid** is being sued in her individual and professional capacities as the Somersworth School District Attorney, she acted under color of state law, and conspired to deprive Lisa Brady of her Constitutional rights under the First and Fourteenth Amendments.  At all times relative to this action, she served as the attorney that argued before the School Board to terminate Brady's employment. Her home address is 24 Brickyard Ln, Eliot, ME 03903. Her work address is Drummond and Woodsum, 501 Islington Street, Suite 2C, Portsmouth, NH 03801-6891.

8. **The Somersworth School Board** *is being sued in its' official capacities.* The Board acted under color of state law, and conspired to deprive Lisa Brady of federal rights, in violation of Constitutional rights under the First and Fourteenth Amendments. The Somersworth School Board, SAU#56, is located at 51 West High Street, Somersworth N.H., 03878 [603-692-4450].   The US Supreme Court has ruled that School Boards can be held liable for purposes of Section 1983. *Wood v. Strickland 365 U.S. 167, 81 S. Ct. 473 (1961).*

9. **Virginia Barry** was the Former Commissioner of the N.H. Department Education at the time of the constitutional deprivation. She is being sued in her individual capacity. She acted under color of state law, and conspired to cause Lisa Brady to be subjected to deprivations of her rights under the First and Fourteenth Amendments. Her current home address is listed as 375 John Smith Hill Road, Bristol, N.H. 03222. Her phone number is listed at 229-380-0437.
The address for the DOE is 25 Hall St., Concord, NH 03301, phone # 603-271-3144.

10. **Richard Farrell** is being sued in his individual and professional capacity. He was a complaint investigator for the New Hampshire Department of Education at the time of the constitutional violation. He acted under color of state law and conspired to cause Lisa Brady to be subjected to Constitutional violations under the First and Fourteenth Amendments. His home address is

3

36 Arrow Ln, Nashua, NH, 603-880-7278. Richard.J.Farrell@doe.nh.gov, 25 Hall St., Concord, NH 03301.603-271-3196.

11. **Dan Habib** no longer works at the University of New Hampshire Institute on Disability. He is being sued in his individual capacities as the film producer for the fraudulent "Axel" film. He acted under color of state law, and conspired to cause Lisa Brady to be subjected to deprivations of her Constitutional rights under the First and Fourteenth Amendments. He was the film producer of *"Who Cares About Kelsey,"* and the mini film *"Axel"* that was and continues to be sold to the public. His home address is 40 Roger Ave, Concord New Hampshire, 03301 & phone #603-330-0748.

12. **Mary C. Schuh** was an "advisor" to Dan Habib's films and also works as an associate professor at the University of New Hampshire Institute on Disability (IOD). She is being sued in her professional and individual capacities. She acted under color of state law, and conspired to cause Lisa Brady to be subjected to deprivation of her Constitutional rights under the First and Fourteenth Amendments. Her home address is 50 Church St, *Concord, NH* 03301, 603-225-9801 mary.schuh@unh.edu. Institute on Disability, 10 West Edge Drive, Durham, NH 03824, (603) 862-2310

13. **Michael McSheehan** works for the University of New Hampshire Institute on Disability (IOD), and was a consultant to the Somersworth School District for the "Axel" film, and he also participated in the film. He is being sued in his individual and professional capacity. He acted under color of state law, and conspired to cause Lisa Brady to be subjected to deprivations of her Constitutional rights under the First and Fourteenth Amendments. He lives at 41 BARBARO DR, Rochester, NH, 03867, 603-866-6524

14. **The National Education Association- N.H. (NEA-NH)**: is being sued in its official capacity. They acted under color of state law, and conspired to deny Lisa Brady her Constitutional rights under the First and Fourteenth Amendment. Their address of the National Education Association, is 9 *S.* Spring Street, Concord, NH 03301 & phone # 603-224-7751.

**15. JURISDICTION & VENUE**

A. Plaintiff files this federal action which; falls under the First and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. §1983.

B. This Court therefore has subject matter jurisdiction under 28 U.S.C. § 1331.

C. All causes of action arose in New Hampshire

D. Declaratory relief is authorized by 28 U.S.C. § 2201 and 2202.

4

E.   Venue in the District of New Hampshire is based on 28 U.S.C. § 1391(b).

F.   **On July 22, 2021** Lisa Brady filed a 42 U.S.C. § 1983 and § 1985 complaint in

NH District Court [case number <u>Case No. 21-cv-614-PB</u>], against Judge Mark

Howard, and the New Hampshire Supreme Court Justices; Hicks, Bassett,

Hantz-Marconi, and Donavan. The case has remained dormant, awaiting appeal,

in the First Circuit Court, case No. 22-1060.  Brady had filed for a different venue

given that Judge Howard's brother, Jeffery Howard was the chief justice for the

First Circuit Court of Appeals at the time she filed her complaint but, that too

was never answered.  The judges were the final co-conspirators in the case at bar,

and the complaints should have been filed at the same time.

G.   "A district court can consolidate related cases under Federal Rule of Civil

Procedure 42(a) sua sponte." See Devilin v. Transp. Commc'ns Int'l Union, 175

F.3d 121, 130 (2d Cir. 1999). Case No. 21-cv-614-PB.

> *"Courts often consolidate actions that they judge could or should have been
> filed as a single action in the first place.  See Ringwald v Harris675 F2d 768
> (5th Cir 1982). The drafters adopted Rule 54(b) "in view of the wide scope
> and possible content of the newly created 'civil action' in order to avoid the
> possible injustice of a delay in judgment of a distinctly separate claim to
> await adjudication of the entire case. 1946 Committee Notes, 5 FRD at
> 472."*

**INTRODUCTION**

**16.** The public had a right to know, and Special Education Teacher, Lisa Brady,

---

*See: 5 CFR § 1201.36 - Consolidating and joining appeals. § 1201.36 Consolidating and
joining appeals. (a) Explanation.  (1) Consolidation occurs when the appeals of two or more
parties are united for consideration because they contain identical or similar issues. For
example, individual appeals rising from a single reduction in force might be consolidated.*

**17.**  The public had a right to know, and Special Education Teacher, Lisa Brady, had a constitutional right to report the exploitation of her special education student, Axel, featured in a public grant funded film. New Hampshire state officials have protected all Defendants in this case. They knew then, and continue to know now, ***that the sale of "Axel" constituted a federal wire fraud***. See18 U.S.C.134.[1] In Joseph A. Kennedy v. Bremerton School District [597 U. S. (2022)], the U.S. Supreme Court engaged in a two-step analysis to determine if Kennedy's speech was protected. Amendment as follows:

> **"The first step** involves a threshold inquiry into the nature of the speech at issue. When an employee "speaks as a citizen addressing a matter of public concern," the Court's cases indicate that the First Amendment may be implicated and courts should proceed to a second step. Id., at 423"
> AND
> "Under the Pickering–Garcetti frame-work, **a second step remains** where the government may seek to prove that its interests as employer outweigh even an employee's private speech on a matter of public concern. See Lane, 573 U. S., at 242. Pp. 15–19" See
> https://www.supremecourt.gov/opinions/21pdf/21-418_i425.pdf.

18.  Lisa Brady's speech cleared the first step because it was a matter of public concern; she reported a criminal act that involved her student's 'false light' exploitation in a public film at the hands of corrupt local and state education officials. The second step in the '***Kennedy' analysis*** would require the defendants

---

[1] Under U.S. Code, Title 18, Section 1343, the elements of federal wire fraud include:
☐    Devised or participated in a scheme or plan to defraud, or **to obtain money or property through materially false** or fraudulent pretenses**, representations** or promises;
☐    With the intent to defraud, deceive or cheat; and
☐    Used or caused a wire communication to be used in carrying out the fraud

6

officials. The second step in the '*Kennedy' analysis* would require the defendants

to justify why Brady's speech should have been suppressed.  In order to do that,

the Defendants would have to argue why their interests in covering up their

involvement with publicly exploiting "Axel" in a film sold world-wide,

outweighed Brady's First Amendment right to report it. The fact that the film is

still selling world-wide without oversight, speaks to an intent to commit fraud.

As the Eighth Circuit Court has held; *"In our mind the public's need to know whether*

*children are being mistreated in school outweighs the other legitimate concerns of the*

*government."* See Bowman v. Pulaski County Special School Dist., 723 F.2d 640,

645 (8th Cir. 1983).

**FRAUD**

19.   The Somersworth School District, led by Superintendent Jeni Mosca and

Pam MacDonald, made "Axel" a public figure. The Somersworth staff appeared

in the film, and ***openly discussed his educational history, and his struggles with***

***being non-verbal and autistic.***  The film boasted about a "miracle;" Axel had

spent his entire education being taught like a preschooler when, in fact, he was

able to keep up with his same aged peers, and on a path to college.  They were

responsible for falsely portraying him on the world wide web, available.... to

anyone.... at any time.

20.  The film did not reveal that the only method used to make the outrageous

claims about Axel's transformation from a pre-school to a grade level

7

functioning, commensurate with his peers, was through the use of facilitated communication (FC or Supported typing), a known harmful technique.

21.  The Somersworth School District teaching staff knowingly lied about Axel's educational abilities, and then used the Family Educational Rights and Privacy Act (FERPA), as a shield to prevent Lisa Brady from publicly exposing them. Brady's protected conduct was a `substantial' or `motivating' factor in the Somersworth School defendant's action. See *Patton v. Indianapolis Public School Bd.*, 276 F.3d 334 (7th Cir. 2002).

22.  Within Lisa Brady's termination letter, it stated:

> "The Board found that the allegations concerning Ms. Brady's repeated communications to third parties, not connected with the School District, containing non-directory personal information regarding a student and, further, her doing so after being advised to cease, was sustained by the evidence. On a preliminary question as to whether the distribution of this information by email to dozens of institutions, publications and governmental officials at all levels, constituted violations of the Family Educational Rights and Privacy Act (FERPA), as the Board understood that Act. the vote was 7 yes and 1 no."

23.  Brady's speech related to the fraudulent content of the film, the unlawful actions of school district administrators, and the *harmful educational method used within a public film (facilitated communication/ FC or supported typing)*.  The student's mother signed a waiver to release her son's record to the public for the purpose of filming "Axel," ***and there was no expiration date***. Brady was Axel's teacher during the latter half of filming, from July to September 12, 2012, when

the film had wrapped up. Axel's mother signed the following redacted copy of a

waiver to Dan Habib.

I _____, give Dan Habib, UNH, and The National Center and State Collaborative
(NCSC) the irrevocable right to videotape and interview _____, and
use his/her name, voice and image in their documentary film project. I understand that this video and interviews
may be part of videos and a documentary film that will be made widely available to the general public as a film,
website and in other media.

I release and discharge Dan Habib, DH Photography LLC, the Institute on Disability, UNH, The National
Center and State Collaborative (NCSC) and all parties designated by the above from any and all claims and
demands arising out of or in connection with the use of this student's spoken words and/or photograph,
including any and all claims for libel, privacy, or emotional distress. I am 18 years old or older. I have read the
above and fully understand the contents.

*24.* Dan Habib's film release did not include permission for Somersworth and

UNH to use facilitated communication, to make up a story about his family,

his interest, or his abilities. He was only allowed to use Axel's "name, voice,

and image." The use of FC was not authorized in his IEP.

25. In *McKaig v. Farmington School Disrtict*, (*Appeal* of *Farmington School District*

*No. 2015-0032*. April 7, 2016) the NH Supreme Court ruled that Farmington

Guidance Counselor, Demetria McKaig was not liable for a Privacy violation

because her release of student information was covered **under** *an exception*

*to the Family Educational Rights and Privacy Act (FERPA) for safety,*

*which; was extended to her by school board policy.* Somersworth had the

same school board policy language with regard to FERPA health & safety

exceptions, that extended to Lisa Brady. Her emails exposing corrupt local

and state education officials was a matter of public concern, and allowable

under Somersworth School Board Policy.

26. After being directed to stop sending emails about the crime to the press, Lisa

Brady was accused of being insubordinate because she did not stop.  She

continued to write about Superintendent Mosca and Pam MacDonald's

involvement with fraud and the exploitation of Axel.  The School Board Policy,

in effect at the time of Brady's employment was identified as policy JRA. It was

listed as exhibit 7 within the Somersworth Administrators evidence binder

during Brady's termination. See exhibit#7 p. 130-131.

27.  Brady was not required to get permission from Superintendent Mosca

*because* school board policy condoned her actions. The pertinent part stated the

following:

> "General Statement. It is the policy of the School Board that **all
> school district personnel** will follow the procedures outlined
> herein as they pertain to the maintenance of student records. (
> Furthermore, it is the policy of the School Board that *all school
> district personnel will follow the provisions of the Family
> Educational Rights Privacy Act (FERPA) and its corresponding
> regulations"*
> On the second page of that policy, it stated:
> "Disclosure of Student Records and Student Information. In
> addition to directory information, the district may disclose student
> records and student information without consent to the following
> parties or under the following conditions.
> 8. **Health and safety emergencies**." See Exhibit 7 p. 130-131.

28.  On **October 15, 2014,** *three months before* Lisa Brady was terminated, she

sent the following email to Superintendent Jeni Mosca, and expressed concerns

about Axel's safety and well-being:

"Subject: Copy just sent to Super Int., Virginia Bary, and Governor Shaheen
From: Lisa Brady <lisa.brady@comcast.net> Date: 10/15/2014 6:25 PM To:
Lisa Brady <lisa.brady@comcast.net>

Dear Superintendent Mosca,
I am concerned you may retaliate.
The letter you sent is too broad for me to know what it is you are talking
about. Please be more specific so that I can offer a defense. Additionally, the
"Axel" video is not considered an educational because it is 'public,' but, the
information within the video that the school district released at the time was
also completely fabricated (not a "legitimate educational interest per FERPA
requirement"), in fact, Michael McSheehan stated the following:
"For a student who was perceived to be low functioning, nonverbal, through
AAC, Axel has been able to actually show that he is bilingual, bi-literate, can
learn grade level curriculum and can excel in engagement with kids without
disabilities."
"Axel's now on a path to college, he's now on a path to having a career
because he has a way to communicate
These fabricated statements, which completely distort Axel's cognitive
abilities, could have potentially posed a <u>safety risk;</u> people coming into
contact with Axel thinking he should know more than he actually does.
There was nothing within Axel's educational records to support the
statements made by Michael McSheeehan and fully supported by both you
and Pam MacDonald.  Especially given that you knew the middle school
team did not agree with the Idlehurst team a year and a half before the video
was released to the public.
The district's interpretation of Axel's abilities were grossly over-stated and
posed a safety risk to Axel.  Anything I may have stated to defend myself
and protect Axel was for 'legitimate educational interest.' Additionally, I was
fully supported by the middle school team, including Principal Hilliard and
Dr. Guare.  Axel's mother told me that she had no idea that the video was
going to be put on youtube.  She wasn't too happy.  Did you ensure that she
had rights explained in both English and Spanish and tell her it would be on
youtube?
Please let me know what specifically I am being accused of so that I can
respond.
Sincerely, Lisa Brady"

**HARM & FACILITATED COMMUNICATION (FC OR "SUPPORTED TYPING")**

29.  In 1993 the *Los Angeles Times* reported a story about Gregory Cracchiola, a teacher who worked with significantly impaired non-verbal autistic students, and how facilitated communication was used to make false claims of sexual abuse.  He was accused of 11 counts of forced sodomy and oral copulation against four of his students, who had reported the assaults through FC.  The case against him was dismissed but, only after the damage had been done to his reputation and teaching career. See https://en.wikipedia.org/wiki/List_of_abuse_allegations_made_through_facilitated_communic ation.

30.  Some other of the many examples that shows harm with the use of FC include:  People v. Jordan, 16 N.Y.3d 845, Mother guilty of manslaughter; Anna Stubblefield, N.J., pled guilty to "third-degree aggravated criminal sexual contact" against her client DJ; she later acknowledged that D.J. was legally unable to consent;  Cordero v. Fumero et al. Case  number 1:2020 cv 20975 (Florida 2020); Hahn ex rel. Barta v. Linn Cty, Iowa , 191 F.Supp.2d 1051 (2002);  Storch v. Syracuse Univ., 165 Misc.2d 621, 629 N.Y.S.2d 958 (1995), claims through FC that girl was being sexually molested; Matter of M.Z., 155 Misc.2d 564, 590 N.Y.S.2d 390 (1992) FC and sexual abuse, there was not enough evidence to show FC was reliable; Wendrow v. Mich. Dep't of Human Servs.; Case No. 08-14324. *For a more complete list see*: https://en.wikipedia.org/wiki/List_of_abuse_allegations_made_through_facilitated_communication.

31.  FC was repudiated in the 1990's,[2] as a known fraudulent communication technique.[3]  In 1995 the Federal Trade Commission prohibited *Louis Bass, Inc.*:

> "From making false or unsubstantiated performance claims about
> any communication aid it offers in the future, and from making
> representations concerning the efficacy of the communication
> devices in enabling individuals with disabilities to communicate
> through facilitate communication, unless the respondent possesses
> competent and reliable scientific evidence to substantiate the
> representation."[3] id.

32. In 2011, Law Professor Brian Gorman advanced an argument for educational

because it has been rejected by the scientific community.[4] He highlighted the

need for increased teacher accountability laws under No Child Left Behind, and

IDEIA 2004 mandates under section 300.302 (a)(4) which; required that

educational and related services be based on peer review research. FC is a

*"scientifically rejected practice. id* p. 48.  He posed the following explanation for the

viability of an educational tort:

> "In sum, the educational malpractice theory has matured along with the field of
> education. It is clear that the unique compatibility of the law under the Frye
> standard, in addition to public policy and the welfare of school children, all
> converge toward the recognition of the integrity of education claim. It is also
> evident that the recognition of the integrity of education tort theory will most
> likely have a chilling effect on education. **The chill, however, will likely be
> limited to behavior risking a conscious indifference to the rights, safety, or
> welfare of students.**" *id p. 50.*

## NEW HAMPSHIRE STATE ACTORS/FRAUDULANT FILM "AXEL"

*33.* This case began in 2012 with the production of the film "Axel," part of the

---

2  Lilienfeld, Scott, Marshall, Julia, Todd, James, Shane, Howard, "The Persistence of Fad Interventions in
the Face of Negative Scientific Evidence: Facilitated Communication for Autism as a Case Example,"
*Evidence Based Communication Assessment and Intervention,* 2014. Pp. 62-101.
[3] Matter of Louis Bass Inc., FTC Decisions, Volume 119, Docket c-3562, p. 316. Available
at:https://www.ftc.gov/sites/default/files/documents/commission_decision_volumes/volume119/ftc
_volume_decision_9_january_-_june_1995pages_316-412.pdf last checked March 25, 2018
[4] Brian J. Gorman, Catherine J. Wynne, Christopher J. Morse, and James T. Todd, Psychology and Law in
the Classroom: How the Use of Clinical Fads in the Classroom may Awaken the Educational Malpractice
Claim, 2011 BYU Educ. & L.J. 29 (2011). Available at:
https://digitalcommons.law.byu.edu/elj/vol2011/iss1/3

*Who Cares About Kelsey* teaching kit produced by Dan Habib out of the N.H.

Institute on Disability (IOD). The Axel film was sold within the teaching kit, and

can still be accessed on *youtube.* A description of Dan Habib's "Axel" film stated

the following:

> "This short film (16:39) focuses on Axel Cortes and the staff at
> Idelhurst Elementary School in Somersworth, NH. Axel is a fifth
> grader with autism who is non-verbal and exhibited significant
> behavioral challenges when he arrived at school. Axel came to
> Idelhurst during his 5th grade year from another school where **he
> was exclusively in self-contained settings and was being taught
> preschool/kindergarten level.** Through effective implementation of
> supports -- including AAC, UDL, RtI, social stories, visual schedules
> and positive behavioral supports -- **Axel was able to learn 5th grade
> general education curriculum in a general education classroom
> within a few months.** His challenging behaviors also decreased, and
> he thrived through interaction and engagement with 'typical' peers.
> **Once Axel had an effective means of communication,** the staff
> found that Axel was bilingual and bi-literate (his family speaks
> Spanish at home). This film illustrates the potential for students with
> **significant cognitive disabilities** to achieve high academic
> outcomes. The film has received support from the National Center
> and State Collaborative (NCSC)."  See
> https://www.youtube.com/watch?v=LIYwTmUgrco  Downloaded
> 5-13-2023.

See Sealed exhibits 1 and 2 which; proves Habib's statement is an egregious lie,

that resulted in Lisa Brady losing her teaching career for blowing the whistle.

## UNH INSTITUTE ON DISABILITY CONTINUES TO FULLY SUPPORTS FRAUD

34.  The U.N.H. Institute on Disability continues to provide support to Dan

Habib's fraudulent Axel film by allowing visitors to gain access to purchase his

film at:  https://iod.unh.edu/inclusive-communities.   When the visitor clicks on

the Who Cares About Kelsey? Project Mini-Films, they can purchase the kit at:

14

https://likerightnowfilms.com/productions/details/3355/Who-Cares-About-

Kelsey (downloaded on 8/8/2023)

Films Dan Habib has developed as a part of the Inclusive Communities Project include:

- "Disabling Segregation" - TEDx Talk
- *Including Samuel*
- *Intelligent Lives*
- Intelligent Lives Postsecondary Transition Mini-Films
- *Keeping Families Together*
- *Mr. Connolly Has ALS*
- *Restraint and Seclusion: Hear Our Stories*
- *Together:* a SWIFT film on Integrated Educational Framework
- *Whatever It Takes:* a SWIFT film on Inclusive Academic Instruction
- *Who Cares About Kelsey?*
- Who Cares About Kelsey? Project Mini-Films - Education Revolution at Somersworth High School, Thasya, Axel, Incarcerated Youth, and more.

Dan Habib advertised for the mini-films and stated the following:



### Axel

Axel is a fifth grader with autism who is non-verbal and exhibits significant behavioral challenges. Through effective communication supports, Axel was able to learn fifth grade general education curriculum in a general education classroom. Support for this film was provided by the National Center and State Collaborative.

*See https://whocaresaboutkelsey.com/multimedia/*

**FEDERAL WIRE FRAUD/N.H. DECEPTIVE BUSINESS PRACTICES**

35.  Dan Habib's continued sale of "Axel" constitutes a federal wire fraud, and in

violation of Deceptive Business Practices, N.H. Rev. Stat. § 638:6 I(e)I: "A person

is guilty of a class B misdemeanor if, in the course of business, he: (e) Makes a

false or misleading statement in any advertisement addressed to the public or to

a substantial segment thereof for the purpose of promoting the purchase or sale

of property or services." Dan Habib's film promotion included false and

misleading statements within the advertisement for the Axel film, as part of the

*Who Cares About Kelsey Teaching Kit*, and available for purchase at his

website.  All Defendants in this case aided and abetted Dan Habib's state and

federal violations of the law.

36. <u>AXEL,' AN EXAMPLE OF HUMAN RIGHTS VIOLATION</u>

Somersworth Speech Pathologist Meghan Davis, *shown below, using FC in the film:*



| | | |
|---|---|---|
| Film Clip @14:22 | Film Clip @14:58 | Film Clip @15:00 <br> See https://vimeo.com/666997 |



**Above caption:** Paused clip from the "Axel" film: evidence of fraud; hand-over-hand method of assistance (facilitated communication). See https://www.youtube.com/watch?v=LIYwTmUgrco





*FC is best compared to a Ouija Board. IDEA 34 C.F.R. Part §300. Requires schools to use peer reviewed research.*

*The Somersworth School District **even allowed other students to type answers for Axel.** Lisa Brady's teaching career was destroyed because she wouldn't go along with the charade.*

37.  The miracle cure (facilitated communication) was never discussed within the

film because Dan Habib knew that his credibility would be destroyed. The

shroud of secrecy, was a willful concealment of the truth.  U.N.H. and

Somersworth staff knew they violated the law.  See Habib's film excerpts below.



**Picture caption:  Paused at 15:29**    See  https://vimeo.com/66699457



**Picture caption: Paused at 15:46**   See  https://vimeo.com/66699457
Habib's film claimed Axel could learn grade level curriculum and was "on a path to college."

"Drawing upon our experience as practitioners in the field of intellectual and developmental disability, we offer the view that it is important to argue against FC from a human rights perspective using the United Nations Convention on the Rights of Persons with Disabilities (2006). *Put simply, FC is an abuse of human rights.*"[5]

38.  In *Source v. B.T. an* Indiana Court of Appeals, Judge, Barteau, HELD:

> "During the demonstration in chambers, Hahn did not look at the keyboard while communicating, and his responses lacked the expected typos. The court also found that Hahn's sister was doing more than facilitating communication, instead directing Hahn's finger to specific keys on the keyboard. The court concluded that the communication was not Hahn's and that he had not exhibited any level of literacy" See *Source v. B.T.*, 83 N.E.3d 144 (Ind. App. 2017)"

39.  Lisa Brady was the only one to report Somersworth's false light violation within the Axel film.  All staff within the film that misstated Axel's cognitive abilities, kept their jobs. Brady reported the intentional exploitation of Axel, and was terminated.  The Somersworth School District conditioned employment on going along with fraud, and demonstrated to staff, an unspoken policy that they would be publicly humiliated, and ultimately terminated if they exercised their right to report the false light invasion of Axel's privacy.

**MATERIAL EVIDENCE OF INTENTIONAL FRAUD**

40.  See sealed exhibits 1 and 2, as part of this complaint: Axel's draft IEP completed two months after the end date of filming Axel.  The second document contains a copy of Axel's most recent psychoeducation evaluation, completed about four months before the start of filming Axel.

---

[5] Chan, Jeffrey and Nankervis, Karen (2015). Stolen voices: Facilitated Communication is an abuse of human rights. Evidence-Based Communication Assessment and Intervention 8 (3) 151-156. https://doi.org/10.1080/17489539.2014.100154
Somersworth School District developed an IEP that showed he performed at a

41. The following release of records shows that Michael McSheehan received a copy of Axel's records, and that he knew or should have known about his profound cognitive deficit, he acted with intentional disregard when he reported otherwise.



## TERMINATION

42. The Somersworth School Board stated the following within Lisa Brady's termination letter, dated January 20, 2015, written by Chair Donald Austin, he stated:

> "The Board noted that ***Ms. Brady's belief that the public's right to know, regarding an <u>alleged mischaracterization of a student in a public video</u>, justified further discussions about the student or his***

*team with unauthorized third parties may explain but does not excuse these violations.* While the Board does not dispute Ms. Brady's right to express her opinions regarding a student's educational program, that opinion must be delivered within the confidential confines of the school and team meetings. Broadcasting that discussion, without explicit parental consent, to the world, steps over the line and violates the spirit and intent of law and District policy. In the Board's opinion, Ms. Brady's continuing to send emails containing this discussion, after receiving the directive of October 14, 2014 from the Superintendent (Administration 20), supported the *Superintendent's charge of insubordination*."

43. There were two glaring problems with Chair Austin's conclusion:

Lisa Brady was not required to report to Superintendent Mosca, and her

actions were approved by school board policy which; trumped the claims of

insubordination.  Moreover, Jeni Mosca was responsible for the school's

participation in the film, and directly involved with criminal fraud.  The school board

turned a blind eye, and acted with deliberate indifference to the crime, and then to

the egregious constitution injuries they inflicted on Brady.

44. In the *McKaig* decision, the N.H. Supreme Court found that the school district's

finding with regard to insubordination were inconsistent with the school district's

policy and stated:

"Concerning insubordination, for example, the state board
reviewed the district's policies cited by the local board and
determined that the plain language of those policies did not
require, among other things, that McKaig report to the
superintendent before acting to prevent the principal from
disclosing Student A's pregnancy." *McKaig v. Farmington School
Disrtict, (Appeal of Farmington School District No. 2015-0032.* April
7, 2016)

45.  The Board Chair, Donald Austin, referred to Lisa Brady's "*alleged*

*mischaracterizations,*" but, he failed to acknowledge any responsibility that the school

20

board may have had with regard to investigating her allegations which; if true, were criminal. When the school Board failed to act, and took part in '*shooting the messenger,*' they acted in furtherance of the conspiracy. unlawfully terminating Lisa Brady to cover up the school's actions.

46. At Brady's termination hearing, the Somersworth School District hired an outside educational consultant, Wendy Jack, who claimed to be a FERPA (Family Educational Rights and Privacy Act) expert but, later admitted that in her 40-year career that she had only completed a handful of FERPA cases. She did not ever attempt to contact Lisa Brady, who was unaware of her involvement in an investigation. She was a 'hired gun" and believed that the false public statements made by Somersworth teaching staff within the "Axel" film were protected, and Brady's reporting of a criminal act, that involved Axel's privacy being forever violated on the world wide web, was a violation.

47. The following testimony occurred during Brady's termination hearing:

> **Ms. Brady**: this is what I have gotten from you: That if it is not -- if it is in the educational record, you cannot say anything about it outside of -- under any circumstance outside of the school?
> **Wendy Jack:** I think I am saying something that's broader than that. In my opinion, if you betray any of what we would call confidential information about a student, whether it's in a written educational record or it came up during a team meeting or even a casual conversation among educators, in my opinion, that's a violation
> **Ms. Brady:** Do you recognize that -- that there's a public right to know when there is -- you know, there's a balance between -- this is a public video. And if it's put out there and it's fraudulent or false, whatever you want to call it, doesn't portray the student's abilities, and you are making comments -- my making comments about a public video, the public's right to know -- the public -- do you feel the public has a right to know that the video is false?
> **Wendy Jack:** Your comments -- we're going to talk about your comments.
> **Ms. Brady:** I asked you if you --
> **Wendy Jack:** I am not going to answer that question. I will answer it this way.

**Hearing Officer Teague:** I have a question. Are you saying that, if you believe that the -- there
was something false in the video, that then waives the student's right -- continued
right to have his privacy because the public has a higher right to then take a look at what is actually happening with the student? Are you saying that?
**Ms. Brady:** I will save that for testimony, because I don't think the board has been explained FERPA in the way it means.
**Hearing Officer Teague:** Are you saying that?
**Ms. Brady:** I am saying that the public has a right to know if the video is false. And I didn't go outside the realm of –the information that was let in while the video was going on through September 12, when I had already worked with this student for over two months—I am saying that—why didn't they take that—what makes the information—the wrong information they chose to put in, right, and the correct information that we had wrong? It's –the pubic has a right to know.
**Hearing Officer Teague:** Well, we have already gone over the fact that this witness has not been hired to analyze the video. But I am very interested in your statement that the public would have a right superior to this student's.
**Ms. Brady:** The public has a right to know if fraud is committed using grant funding.
**Hearing Officer Teague:** Well, I don't think asking this witness about any of that is going to accomplish anything.
**Ms. Brady:** Well, I am asking her if she doesn't think the public—does she think the public has a right to know that the video is false?
**School Board Member Hiller:** Why does that matter?
**Ms. Brady:** It matters.
**Hearing Officer Teague:** I think she's answered that she can't.

## FERPA

48. The Axel mini film was not an educational record. It was not maintained by the Somersworth School District, and was made widely available to the public. The film was directly related to Axel's education, revealed his diagnosis, educational history, followed him throughout his school day, openly discussed his behavioral problems, and idiosyncrasies, interviewed his teachers, and his parents. Dan Habib secured a release of information to allow him to distribute the film, and make it widely available to the general public. The content within the film is not a protected FERPA record. His mother waived that right. The intentional falsities discussed within the film, are not considered a

protected record. The following testimony from Lisa Brady's termination hearing, proved

that Consultant Wendy Jack believed Lisa Brady was required to keep quiet, and go

along with the school's fraud. The excerpts detailed within the testimony were the

statements that Wendy Jack deemed damning, and in violation of FERPA:

### 49. TERMINATION TESIMONY

| | |
|---|---|
| Lisa Brady Q. | (By Ms. Brady) At the top, it says **"Dan Habib was part of a crew that took advantage of and exploited a nonverbal, autistic student in order to promote his film about inclusion."** Does this relate directly to Axel, or does -- or is it talking about how a student in a public video was exploited?  What's the main theme? |
| Wendy Jack: | Let me just think about your question for a minute.  Let me read this and then I will answer you. Ask me your question.  Does it – |
| Lisa Brady Q. | Does it directly relate to Axel, or does it relate to the exploitation of a student on a public film? |
| Wendy Jack: A. | I think it will -- it directly relates to the student. |
| Lisa Brady Q. | You don't read that -- |
| Wendy Jack: A. | The statement says he was part of a crew that took advantage of a nonverbal student.  So it directs -- it relates to the student. |
| Lisa Brady Q. | So you are reading it as, just because his name was in there, that it was about -- that it violates FERPA? |
| Wendy Jack: A. | I believe it violates FERPA, yes. |
| Lisa Brady Q. | Okay.  Because the law says that it has to be directly related to the student. |
| Wendy Jack: A. | And I believe it is directly related to the student.  That was the first question you just asked me. |
| Lisa Brady Q. | <u>And it is housed in the school district</u>. Did you read that in Axel's educational records at School? |
| Wendy Jack: A. | I am sorry? |
| Lisa Brady Q. | Was that statement in Axel's record at school? |
| Wendy Jack: A. | This statement?  No.  It was not in there. |
| | The direct statement was not in the record.  This is your statement. |
| Lisa Brady Q. | It's not an educational record.  It's not protected. |
| Wendy Jack: A. | That statement is not. |
| Lisa Brady Q. | The statement is not protected, and it's not a violation of FERPA. |
| Wendy Jack: A. | Well, I believe it is. |
| Lisa Brady Q. | Okay.  We'll keep going. |
| Lisa Brady Q. | All right.  On page 7, I have written **"They conspired to deceive the public using an experimental communication method referred to as facilitated communication."** How is that a FERPA violation?  Is that in Axel's educational record at the school? |
| Wendy Jack: A. | No. |

| | |
|---|---|
| **Lisa Brady Q.** | Do I identify -- do I identify -- what is the main theme of that? Because that's what you have to look at, the main idea. |
| **Wendy Jack: A.** | The main idea is -- discussing facilitated communication, I believe it's a violation of FERPA. |
| **Lisa Brady Q** | Okay. And you believe that because I discussed facilitated communication? |
| **Wendy Jack: A.** | Yes. |
| **Lisa Brady Q.** | Okay. If we go to the next one, **"The team's sudden discovery that of Axel's abilities was based solely on FC."** |
| **Wendy Jack: A.** | I think that's even clearer. I think that's the clearest of the three violations. |
| **Lisa Brady Q.** | But that was -- that was in the film. That -- you know, that that was in the film because they suddenly became aware that he was college bound; right? So that was actually in the video; |
| **Wendy Jack:** | A. Correct |
| **Lisa Brady Q.** | Thank you. |
| **Wendy Jack A:** | **"I began working with Axel in July 2012, along with a full team of specialists at Somersworth Middle School. Our team had a strong difference of opinion with regard to Axel's abilities from what was portrayed on the video."** |
| **Wendy Jack: A.** | This one is a blatant. |
| **Lisa Brady Q.** | But the timeline is September 12. And I have a -- |
| **Lisa Brady Q.** | (By Ms. Brady) When did the film end? |
| **Wendy Jack: A.** | According to this -- well, he talks about interviews on the 12th. |
| **Lisa Brady Q.** | So if it ended on the 12th, there would have been time for the middle school team to disagree during the filming. |

**Wendy Jack: A.** I don't think that's the point. I think the point is that this information is a violation of FERPA. I don't -- *my point is that it's not appropriate to make that kind of a statement ever as a special education teacher or regular education teacher*. To make a statement like ""our team had a strong difference of opinion," in my opinion, is not an appropriate statement for an educator to make. That's my answer.

| | |
|---|---|
| **Lisa Brady Q.** | Do you think it's appropriate for a film to be playing every single day on YouTube? |
| MS. KINCAID: | Objection. |
| MR. TEAGUE: | Okay. I am going to say that that's just a question that -- |
| MS. BRADY: | I am asking -- |

MR. TEAGUE: This witness can't possibly answer it. It's beyond the scope of her testimony and it's hypothetical. And, again, you can argue that, and I suspect you will, when it's time for you to testify. But this witness can't start speculating about is it appropriate for a film to be shown or contain information when she wasn't asked to analyze the film or its appropriateness. She was asked to analyze the appropriateness of the information you shared with the public.

**MS. BRADY:** Right. And if you look on FERPA, Exhibit (C) under "FERPA" – …Continue. (By Ms. Brady) It's a book. And they talk about invasion of privacy and what they consider an invasion of privacy. And I just want you to take a look at No. 3.Can you read that?

24

**Wendy Jack:** A.   "False light:  Placing a person in a false light or a dubious perspective through the publication or dissemination of facts that may, on their own, not be objectionable or defamatory."

**Lisa Brady** Q.      So would that have concerned – would you have been concerned if you were interviewing and know -- if you had access to all the documents and you knew there was a discrepancy between what the middle school believed and what the Idlehurst team believed -- if you knew there was a discrepancy and the video moved forward, would --would you concur that the district is in violation of FERPA?

**MR. TEAGUE:** I think we're right back to asking the witness to analyze something she was not asked to analyze and asking her to speculate, again, about a totally different subject.  Did the district violate FERPA? That's not what she was asked to do, to analyze that issue.

**MS. BRADY:** But these are things she should have had -- if she had talked to me during the interview, she would have access to this.  I would have given her this information. I wasn't allowed to participate.

**MR. TEAGUE:**  And I think she's already explained that she doesn't do the calling of witnesses.  That's the administration that does that.  And she's given you her understanding as to why it was that she didn't interview you. And that's about as far as she can go on that. During your testimony I think it would be quite appropriate for you to explain why that happened that way.  But this witness can't really go beyond what she knows and you are asking her to.

**MS. BRADY:**  It's -- she's -- she's expressing that she was a FERPA -- she's claiming she has FERPA expertise.

50. Middle School Principal and Mayor Dana Hilliard knew the "Axel" film was

fraudulent back in 2012 when he transitioned to the middle school, and was obligated

to intervene to stop the criminal act. He testified at Brady's termination hearing:

| Brady Question (Q) | Hilliard Answer (A) |
|---|---|
| Q.      Dana, is it fair to say that you did not support the film produced by Dan Habib with regard to "Axel?" | A.      Are you talking in past or present? |
| Q.      I am talking in past. | A. And to answer that question in what format? |
| Q.      It's pretty direct.  Did your mind change? | A.      It's not.  I am confused by the nature of the question. The film, in general? |
| Q.      Did you -- do you support the abilities that they were -- that they described in that film? Do you think that film is a fair representation of his abilities? | A.      Whose? |

| | |
|---|---|
| Q.     Axel's. | A. I don't think the film was questioning Axel's abilities. Do I think the film is a fair teaching tool? Yes. Do I think the film is a fair teaching tool utilizing classrooms |
| Q.     I didn't ask you that. | A.     Again, you will have to clarify what the question was. |
| Q.  (By Ms. Brady) Can you please just read it, read the email. I sent you a -- a link to the Axel video on -- was it 7/23? | A. 7/11. |
| Q.     7/11/13? | A.     Yeah |
| Q.     And what was your response? | A. Do you want me to read it? It's in front of everyone |
| Q.  (By Ms. Brady) Yes. | THE WITNESS:  I am asking the chair at this point I don't want to not follow your procedure. |
| MR. TEAGUE:  It's contained in the exhibit? | THE WITNESS:  It is. |
| MR. TEAGUE:  Okay. | THE WITNESS:  So do I need to read it? |
| Q.  (By Ms. Brady)  I think you need to read it so we know -- | THE WITNESS:  I am asking the chair. |
| MR. TEAGUE: Then if you would, please. | THE WITNESS:  Absolutely. |
| Dana A: "They should be ashamed of themselves.  It amazes me how greed and self-promotion has no limits.  Keep doing what you are doing.  Keep doing what -- You are the best at it.  You are making a difference." I will also point out that was sent on my personal email, thus personal opinion, not school email.  That's why it says "sshilliard@hotmail.com," | |
| | |

51. . Hilliard's email was sent in response to Lisa Brady sending him a Link to the Axel film:

> Subject: Re: Axel
> Date:    Thu, 11 Jul 2013 12:07:05-0400
> From:   Dana Hilliard <sshilliard@hotmail.com>
> To:      Lisa Brady<lisa.brady@comcast.net>
>
> They should be ashamed of themselves. It amazes me how greed
> and self promotion has no limits. Keep doing what you are best at,
> you are making a difference. D. Sent from my iPhone

52. When Somersworth Special Education Director Pam MacDonald testified at Lisa

Brady's termination, she stated the following with regard to how they determined Axel's

cognition within the film.

> Q.  **(By Ms. Brady)** When Axel suddenly became college bound, what was
> this based on?  Was it based on any other thing other than facilitated
> communication?
>
> A. **Pam:** I don't believe so.  I think that the movie, when they were talking
> about that, was based on inclusion.  That's what the -- that's what the topic
> of the movie was, inclusion.
>
> Q. **Lisa Brady;** What did they base their evaluation of Axel on?  You have
> to have a basis for saying somebody is college bound.  So, I am asking you
> what was their basis for saying he was college bound? What evaluation did
> they use?
> MR. TEAGUE:  If the witness knows.
> A.  Pam: I don't know.

53. On January 4, 2019 Somersworth Speech Pathologist Robin Scott was deposed and

the following testimony ensured: Please note ASHA (American Speech-

Language Hearing Association)

**Lisa Brady Q.**  Do you believe that student's academic abilities were
*grossly mischaracterized in the public film?*
**Robin Scott A.**  *Yes.*
**Lisa Brady Q.**  Would you ever use facilitated communication with a
student?
**Robin Scott** A.  It's not sanctioned by ASHA.
**Lisa Brady Q.**  So that's no?
**Robin Scott** A.  No.  That's no.  I'm sorry.

54. All Lisa Brady's teacher professional evaluations at Somersworth were excellent,

the last evaluation completed, prior to termination, was on May 13, 2013 and noted

the following:

Teacher: Lisa Brady                Administrator: Kate Segal, Asst. Principal SMS

**Somersworth School District**

Summative-Assessment
School Year 2012-2013

Key:  N...Novice    B...Basic    P...Proficient    D... Distinguished

| Domain 1: Planning and Preparation | N | B | P | D |
|---|---|---|---|---|
| 1a. Demonstrating Knowledge of Content and Pedagogy | | | | X |
| 1b. Demonstrating Knowledge of Students | | | | X |
| 1c. Selecting Instructional Outcomes | | | | X |
| 1d. Demonstrating Knowledge of Resources | | | | X |
| 1e. Designing Coherent Instruction | | | | X |
| 1f. Designing Student Assessments | | | | X |
| **Domain 2: The Classroom Environment** | | | | |
| 2a. Creating an Environment of Respect and Rapport | | | | X |
| 2b. Establishing a Culture for Learning | | | | X |
| 2c. Managing Classroom Procedures | | | | X |
| 2d. Managing Student Behavior | | | | X |
| 2e. Organizing Physical Space | | | | X |
| **Domain 3: Instruction** | | | | |
| 3a. Communicating With Students | | | | X |
| 3b. Using Questioning and Discussion Techniques | | | | X |
| 3c. Engaging Students in Learning | | | | X |
| 3d. Using Assessment in Instruction | | | | X |
| 3e. Demonstrating Flexibility and Responsiveness | | | | X |
| **Domain 4: Professional Responsibilities** | | | | |
| 4a. Reflecting on Teaching | | | | X |
| 4b. Maintaining Accurate Records | | | | X |
| 4c. Communicating With Families | | | | X |
| 4d. Participating in a Professional Community | | | X | |
| 4e. Growing and Developing Professionally | | | X | |
| 4f. Showing Professionalism | | | X | |

Commendations include collaborating with administration and advocating for the best interest of our middle school students, as well as facilitating and ease managing a self-contained classroom with students with significant learning differences, while integrating them, as much as possible, into the regular classroom settings. Area for improvement includes continuing to work effectively respectfully with all SAU and district staff and administration.

Administrator's Signature: _____    Date: 5-29-13

Teacher's Signature: _____    Date: 5-29-13

The teacher's signature does not indicate approval or disapproval of this evaluation report. It merely denotes the teacher has seen this evaluation and has received a copy.

2/09

## PAM MACDONALD GRIEVANCES

55. On **September 3, 2012** Lisa Brady filed a grievance against Special Education

Director, Pam Macdonald.

> **Subject: Grievance**
> **Date: Mon, 03 Sep 2012 00:02:10-0400**
> **From:** Lisa Brady <lisa.brady@comcast.net>
> **To:** jmosca@sau56.org, Bob Marquis <bmarquis@SAU56.k12.nh.us>,
> dhilliard@SAU56.ORG, pmacdonald@SAU56.ORG
> Dear Jeni and Bob,

I have attached a grievance against Pam MacDonald. I have also attached data
that my team collected over the summer related to my student I have removed
his name from all documentation and refer to him with initials.
Thank you for taking the time to review my concerns. Lisa
***Just some of the claims noted within the complaint included:**

28

**Professional Grievance**
9/2/2012
This grievance is to document issues associated with the inappropriate actions by
Pam MacDonald, Director of special education, against me, concerning the
education of a student in my special education program at the middle school.
The student, to be referred to as ▋▋▋ is diagnosed with Autism and has recently
transferred from Idlehurst Elementary to the Middle School.
Specifically, Pam MacDonald has established a hostile environment in providing
a Free and Appropriate Public Education (FAPE) to ▋ by:
• Failing to address my repeated communications both verbally and by e-mail
concerning the implementation of a FAPE for ▋▋
• Directed me to conform to an IEP that does not provide ▋ with a FAPE
• Stated she would not approve an evaluation despite one not having been
completed within the Somersworth School District and the current language
evaluation being well over three years old.
• *Adopted and directed implementation of an IEP that does not list*
*facilitative* communication as a specific communication support service for
academics of district wide assessments yet, she expects it to be utilized.
• Adopted an IEP without any academic goals, for a sixth grade autistic
student that does not have basic alphabet and number recognition
• **Authorized the use of a communication method (facilitative**
**communication) that is known to be highly controversial and not condoned by**
**the student's parent (**\*see page 7-8 for professional organization position
statements with regard to facilitative communication)
• Failed to consider information from testing at Somersworth that shows the
facilitative communication is not working.
• Used functional communication as the sole criteria for developing ▋▋▋ IEP
• ( See§ 300.304 Evaluation procedures) and did not consider other criteria
(e.g.academic, self help). This conflicts with 34 CRR §300.304 Evaluation
Procedures. (\*See p. 9-10 for applicable CFR requirements).

56. **On or About September 5, 2012**, Assistant Superintendent Bob Marquis

approached Lisa Brady, and informed her that if she did not drop the complaint

against Pam MacDonald, *she would lose her job.*

**BRADY ACCUSED MACDONALD OF VIOLATING SPECIAL EDUCATION**
**LAWS AGAIN**

57. **February 1, 2013** Lisa Brady sent the email below to Special Ed. Director Pam

MacDonald, with regard to her student's special education rights:

**From: Lisa Brady Sent: Friday, February 01, 2013 7:06 PM**
**To:** Pam MacDonald; Jeni Mosca; Pam MacDonald
**Cc:** Bob Marquis **Subject:** RE: ESOL
Dear Pam,
As the director of Special Education, you should know that sending AC to ESOL
on Monday, after we had agreed as a team at his last IEP meeting that it would
not be appropriate, **would be in direct violation of the Individual's with
Disabilities Education Act.** Unilateral decisions made outside the context of a
team meeting violate AC's rights to FAPE. We had a certified ESOL teacher at
that meeting and AC's mom indicated that she did not want him to continue
with ESOL service. **We all agreed and removed the service provision from his
IEP.** I am not an ESOL specialist but I did look up NH regulations (p.2) and cut-
and-pasted the following provisions. AC's mother is allowed to curtail his ESOL
services at any time. *You have no right to insist that he goes against her wishes.*
In light of the ESOL rules that I looked up, I am requesting that the ESOL
teacher not attend AC's next meeting. Aside from the fact that AC's mother has
every right to curtail ESOL services at any point, it is likely going to upset her
since we have spent the past few meetings doing damage control related to the
negative experiences she has had in Rochester.
http://www.education.nh.gov/instruction/integrated/esol/documents/esol_g
uidance8-21-12revised.pdf
**New Hampshire State Guidance on Programs for English Learners
Identification of English Learners**
2. The School District must provide an oral interpretation or a translation of
required parental notifications if requested by parents or if the need is obvious.
3. Parents have the right to enroll their child in the program or to decline the
instructional Services for English Learners.
4. The ESOL teacher should file the written response/permission form from
parents in the student's cumulative folder and keep a copy in the EL working
file.
5. Parents may choose to remove a student from the program for English
Learners at any time. Likewise, they can choose to re-enroll the student in the
program if the student is still eligible for services.
I appreciate you taking the time to read this e-mail.
Lisa

**PAM MACDONALD RETALIATED:**
**She violated the law and then papered Brady's file with false claims.**

58. **March 22, 2013** Pam MacDonald issued a warning, signed by Dana Hilliard:

"Failure to follow directives: "With respect to a particular student, after
meeting with the superintendent, Dana Hilliard and Pam MacDonald on

**December 20, 2012,** you were advised that the IEP team does not have the authority to discontinue ESOL services and that the NH Department of Education concurred in our assessment. You have been advised that whether or not a student should receive ESOL services *is governed by a different process*. You were repeatedly advised to convene an IEP team meeting and undo the mistake that was made. You *were specifically advised not to seek an IEP change via an amendment*, but you disregarded that directive *and did not convene an IEP team meeting as directed*."

59. Brady <u>did not seek an IEP amendment change</u> as indicated, Pam's written statement was an intentional lie that was not backed up with a shred of evidence. Brady also convened an IEP meeting. The Board accepted Pam MacDonald's incompetent statements that ran counter to special education law, and Brady's employment was terminated based on her compliance with the law.

60. The district's ESOL teacher was present at the December 20, 2012 IEP meeting, and agreed ESOL should be removed. The full IEP team agreed, including *Principal Hilliard, who acted as the district LEA* (administrator with final decision-making power). He authorized the IEP change, then signed the warning in support of MacDonald. He knew that it ran counter to ESOL regulations that allow parents to withdraw their child at any time.

61. Like ESOL services; Parents have the right to revoke consent at any time, and that included an IEP meeting when ESOL services were listed within an IEP. See IDEA subpart D., section <u>300.300</u> Parental consent.

> <u>(4)</u> If, at any time subsequent to the initial provision of special education and related services, the parent of a child revokes consent in writing for the continued provision of special education and

related services, the public agency — (i) May not continue to provide
special education and related services to the child, but must provide
prior written notice in accordance with §300.503 before ceasing the
provision of special education and related services;

62.    If ESOL was governed by a different process, Pam should not

have insisted that it be put back in the student's IEP.  Any service in the

IEP can be removed by the IEP Team, and the ESOL teacher was present

and authorized the change.  Parents have the right to deny any service.

The ESOL teacher and Dana Hilliard were not given a warning.  Pam

MacDonald and Hilliard *showed disparate/retaliatory treatment when*

*they issued the warning* to Lisa, when it was a full IEP team decision.

The decision to remove the student was in compliance with the law

ESOL regulations and special education law. Pam MacDonald's motive

was to retaliate against Brady for documenting her violations of

student's rights in September of 2012, and then again on February 1,

2013.  Additionally, Brady had scheduled two meetings; one was

cancelled by the parent, and the other due to a snow day. Pam was

frustrated by the cancellations which; were beyond Brady's control. She

then put her secretary in charge of setting up the meeting on February 8,

2013 and she failed to set up a meeting too, and yet she was not

punished.  On March 4, 2013 Brady set up an IEP meeting for March

25th. **Pam MacDonald issued the warning on March 23, 2013,** two days

before the planned meeting, she knew about, and claimed Brady "failed

to convene a meeting."

### NEXT FALSE SOMERSWORTH ACCUSATION

63. Within Brady's termination letter, signed by Chairman Austin, it stated:

> (1) "During that same meeting on December 20, 2012 with the Superintendent, Principal and Special Education Director, **you confirmed that you failed to administer the NECAPS assessment to the student this school year as is required.** The student's IEP called for its administration with accommodation, which you advised us that you did not give to him. You listed the student in the IEP as "Not Participating.*" As you are aware, every student is required to participate in the NECAPS with very few exceptions*. The limited exceptions, such as medical emergency, emotional distress, death in the family, do not apply in this case and accordingly, the State Director of Assessment would undoubtedly refuse to authorize such an exception. *Your failure to ensure that the student participated in the NECAPS this year is in contravention of our special education obligations to the student."*

64. The School Board's statement was *grossly incompetent* given the facts: "*An alternative assessment is an assessment designed for children with disabilities who are unable to participate in the regular state assessment, even with appropriate accommodations. (20 U.S.C. 1412(a)(16)).*" Brady's student had not yet mastered numbers 1-10 or his ABC's. Pam MacDonald gave Brady a warning for doing what was required by law. Before entering Brady's program, the Idlehurst Elementary IEP team had taken the student off the alternative assessment, *in defiance of IDEA and N.H. State DOE regulations*. The student was incapable of taking the NECAP testing, and could only do so if an adult used hand-over-hand assist, FC, **to cheat.** Just like they did in the film. There is no legal accommodation under the NECAP testing for hand-over-hand assist. Again, Somersworth Administration violated Brady's student's civil rights, and

33

had Brady terminated for following the law. Pam MacDonald stated the following at

Brady's termination hearing:

| | |
|---|---|
| **Ms. Brady Q.** | Was AC on an alt. portfolio? Do you recall that? |
| **MacDonald A.** | I recall that the IEP team met in May and decided that they weren't going to go forward with the alt. portfolio |
| **Ms. Brady Q** | Beginning of May or end of May? |
| **MacDonald A.** | The exact date, I don't know. |
| **Ms. Brady.Q** | It was -- was it past the window? |
| **MacDonald A** | Was it past the window? |
| **Ms. Brady Q** | Right. The Department of Ed is very clear about dates and when they come to pick up these alt. portfolios. |
| **MacDonald A.** | I am not sure. |
| **Ms. Brady Q.** | Okay. Because -- did they send one in at all? Are you aware? |
| **MacDonald A.** | *I don't believe they did.* |
| **Ms. Brady Q.** | Right. And so the law requires that even if they -- they have to send in one -- even if they decide in May that they are not going to do it, they still have to send what they finished in. You are aware of that; right? |
| **MacDonald A.** | Correct. |
| **Ms. Brady Q.** | *Right. And so did Idlehurst violate IDEA when they didn't send that portfolio in?* |
| **MacDonald A.** | *I believe they did.* |

65. Somersworth School Administrators showed disparate treatment; they

condoned the violations of law committed by Idlehurst, and issued Brady a

warning because she was not willing to go along with the school's use of FC to

make false claims about her student's intelligence. The student had never

participated in the NECAP testing because he was among the "few exceptions"

that the Board spoke about within Brady's termination letter.

66. **On 4-01-13,** Lisa Brady sent a complaint to Superintendent Mosca  directly

related to Pam MacDonald, false and retaliatory warning, along with emails to

back up her civil rights claims.

67.  On or about the first week of April, Assistant Superintendent, Bob Marquis,

**again directed Brady to withdraw the grievance or risk termination of her**

**employment.** Marquis also recommended that she place a rebuttal in her

personnel file.  Brady was threatened with termination after she filed both of her

grievances against Pam MacDonald.

68.  Within Brady's termination letter the School Board Stated the following:

*"**In the classroom**, Ms. Brady's tendency to turn disagreements into intemperate, unsupported allegations appears to have poisoned the relationship between Ms. Brady and a paraprofessional."*

69.  According to all of Brady's professional evaluations during the course of her seven and half years working at the middle school, she was regarded as proficient and distinguished.

- No parent ever filed a complaint
- No student ever filed a complaint
- No staff member ever filed a complaint
- There was never one instance of supervisory discipline regarding a complaint of any kind filed against Brady.
- There was never any disturbance in any classroom on campus caused by Brady but, she was skilled at de-escalating all kinds of problems that routinely came up during the course of a school day.
- There were no middle school witnesses called to testify at her termination, just the three administrators trying to terminate Brady's employment in retaliation for whistle-blowing, **relying 100% on speculation and hearsay**.
- The School District produced no material evidence to back up anything they claimed.

70. In December of 2013 Lisa Brady reported concerns to Principal Dana Hilliard about

her program assistant and her admitted use of Oxycontin in school which; changed

her ability to function effectively. She sent the following email to Dana Hilliard:

Subject:Brewing Date:Sat, 14 Dec 2013   09:44:32 -0500
From:Lisa Brady To:Dana Hilliard

Dana,

> On Thursday I found out that someone near to me in the room has been on Oxycontin for pain. I had words with her on Thursday, not about oxyC, but about other things that have been bothering me.I know she has medical problems with her pain however; her chemistry is off and she is not her usual self. I want to keep you in the loop because although this individual can be a dynamo, I also know she has addiction issues. I will touch base with you next week. Lisa

71. Principal Hilliard never did anything to intervene in Brady's class, and allowed the employee to escalate her behavior. She fell asleep working with non-verbal autistic students, placed students in precarious positions on therapy balls, and became more and more difficult to be around. Brady left notes with Hilliard. He ignored Lisa Brady's concerns about safety, and allowed a problem to fester. Somersworth Administration claimed Lisa Brady had a problem with her assistant, and that it was only between them when other staff members at the middle school were aware of the problem as well.

72. Lisa Brady sent the following email to Middle School Speech Pathologist, Robin Scott, directly related to her assistant, and concerns about safety with taking her students to the pool.

> From: Lisa Brady [mailto:lisa.brady@comcast.net]
> Sent: Sunday, December 15, 2013 10:22 AM
> To: Robin Scott
> Subject: FYI Drugs
> Liability- Swimming- She can no longer go, how can we trust her in the pool and shower when she needs someone looking out for her safety?
> poses a direct threat to health or safety impaired ability to perform job functions
> new behavior; unexplained disappearance poor concentration lowered productivity errors in judgement inconsistent work quality lack of trustworthiness extremely defensive, suspicious Depressed flat affect

36

CNS depressants, also known as sedatives or hypnotics, treat anxiety and/or sleep disorders by slowing normal brain function. individuals who use these drugs long-term develop tolerance quickly and must use increasing amounts in order to feel an effect. People who abuse CNS depressants should not attempt to stop on their own due to the risks of withdrawal, which may be life-threatening. For example, when someone stops taking CNS depressants, his or her brain activity may rebound so quickly that seizures result.

73. Robin Scott emailed back, and stated:

      ——————Original Message——————
      Subject:RE: FYI Drugs
      Date:Sun, 15 Dec 2013 -0500
      From:Robin Scott <robinsas@comcast.net>
      To: 'Lisa Brady' <lisa.brady@comcast.net>

      I am total agreement with you. I personally, **feel she should be written up with documentation that you have given her a verbal warning.** This is ridiculous.
      Robin

74. Robin Scott did not testify at Brady's hearing, Brady could not compel any witnesses to counter Mosca, MacDonald, and Hilliard's defamation of her character. Hilliard was responsible for investigations at the middle school, and Ms. Scott's "ridiculous" comment was directed at him. Robin Scott also testified about the assistant under oath, and stated:

**Lisa Brady Q.** Did the staff member ever talk to you about domestic disturbances at home?
**THE WITNESS:** Do I have to answer that?
**MR. CULLEN:** Yeah, I think you probably have to answer that. In this time period?
**MS. BRADY:** In this time period that she worked with her.
**MR. CULLEN:** Yeah. (Pause.)
**THE WITNESS:** I know things were rough with her, and I think it was her husband. Then her husband. I knew it was rough. It was a rough time in that household.
**Lisa Brady Q.** Did you ever witness or report to anyone at school that the staff member had -- had been physically aggressive with a student?
**THE WITNESS: A. Yes.**
**Lisa Brady Q.** Did you and your speech assistant witness the staff member shove a desk into the student -- into a student in my classroom's stomach while disciplining him?
MR. CULLEN: I'm going to object here –
**THE WITNESS: A.** I didn't --

37

Continued…..**Lisa Brady** Q.   You did say you witnessed her physical aggression?  You previously testified.
**THE WITNESS**: A.   I didn't -- I didn't witness it.  My assistant did.  She came to me.

75. Brady's assistant sent an email acknowledging her problem:

> Original Message
> Subject: sorry for whatever I have done Date: Wed, 15 Jan 2014 (PST)
> From:▮▮▮▮▮▮▮  Reply-To:▮▮▮▮▮▮▮
> @yahoo.com>To:lisa.brady@comcast.net
> <lisa.brady@comcast.net>
> First of all I love my job but more important I love working with you. I've always thought highly of you and consider you a friend. I Dont know what I did to make you turn on me. I knew something was up when you snap at me going to get the OT key. Lisa I have more respect for you than any friend I ever knew, your strong smart and fun to be with .1f it wasn't for you noticing the medication was affecting me I don't know were I be. *I don't recall alot that I did or said during that time I'm sorry if I did do something.* I do want to finish my year here and I hope you can trust me again. I ve trusted you, and always will.. I always thought of us as a team . It just seems I can't do or say anything write in the class or to you I guess.
> Thank you for your time. I love you Lisa no matter what. I really do not no what your upset about if I did I would talk to you about it. Always Starr

76.   Within Brady's termination letter it stated the following:

> "The Board found that the charge that Ms. Brady acted in an unprofessional and unethical manner when she sought to have bodily fluids of another staff member tested for identification without the knowledge or consent of the staff member and thereafter reported the results of the test to others was sustained by the evidence. The Board found (by a vote of 7 yes, I abstention) *that the* behavior violated RSA 141-H:2. School District policies, in particular the Staff Ethics Policy GBEA (Administration #7), were also cited by the Board as prohibiting this conduct."

77.   The Somersworth School Board, in finding that Lisa Brady violated the law, acted in furtherance of the conspiracy to deny her First and Fourteenth Amendment Constitutional rights to due process. They knew that there was no material evidence to support that Lisa

38

Brady violated the law, and that she had not been given any opportunity to defend those

charges, with a due process hearing in a court of law, where should could have compelled

witnesses, and had an opportunity to provide material evidence. The Somersworth School

Board, Dana Hilliard, Jeanne Kincaid  violated NH Rev Stat § 644:11, when they put in

writing, and read aloud at her termination hearing, information which they knew to be

false and would tend to expose Brady to public hatred, contempt or ridicule. They did so

arbitrarily, capriciously, and without any material evidence to support the defamation of

character.

78.  At Brady's termination hearing, she questioned Jeni Mosca's Consultant,

Wendy Jack, about Director, Pam MacDonald's comments that had been

included within her report to the school district:

> Q. Lisa Brady: "This consultant began the interview asking Ms.
> MacDonald why Ms. Brady became so dissatisfied with the district.
> Ms. MacDonald stated that Ms. Brady was dissatisfied with team
> meetings when others disagreed with her. She valued only her own
> opinion, not the opinions of other professionals that made up the
> special education team."
> When she -- *did she provide you with any evidence to back up that
> comment*?
> A.  WENDY JACK: Not written evidence.

79.  Wendy Jack did not use evidence, just speculation for payment. Wendy Jack

made no attempt to contact Lisa Brady.

On or about 1-5-2014, Brady returned from break, and discovered evidence of a

violent act that clearly communicated a threat. (U.S. v. Zavrel, U.S. Ct. Apps., 3rd

Cir., 384 F.3d 130, Sept. 21, 2004 *an act alone, without any writing, can communicate a

threat in certain circumstances*.)  Brady's file cabinet was kicked-in, and her

identification badge had visible impressions from teeth marks, along with a large accumulation of dried brown saliva. Brady reported the threat to Hilliard, and had several conversations about the incident, and the prospect of submitting the abandoned DNA for testing. Testing was a reasonable action because an escalation of violent threats could potentially form the basis of a court order compelling the collection of a DNA sample from suspects for comparison to confirm identity with the threatening act discovered on or about January 2, 2014. School Officials' argument that the testing of DNA, of anonymous saliva abandoned on a sidewalk, or abandoned on an ID badge, violates RSA 141H:2 is laughable. The exploitation of Plaintiff's fear for her safety at the workplace, and reasonable suspicion of an aggressor, into a finding of a "knowing" violation of the prohibited "taking" of DNA from an individual for testing that risks exploitation of private health information is an outrageous pretext for retaliation and a sham termination hearing. RSA 141 H:2 simply does not prohibit testing of anonymous & abandoned DNA. The assertion made by School Officials that Brady's good faith, and approved testing of abandoned an unclaimed DNA discovered through a threat of violence, meets the scient or factual requirement of a "taking," required of RSA 141 H:2 is patently absurd, and reeks of particularly callous retaliatory animus.

80. The DNA results Brady sought were useless, *unless and until*, a lawful comparison sample could be obtained from a suspect by consent, or court order, as per RSA 141 H:2. A test of abandoned DNA alone, absent "a taking" from a positively identified individual, does not violate RSA 141 H:2. Moreover, testing abandoned DNA presents no risk to any

individual, or the public. In fact, this interpretation of RSA 141H:2 would have a chilling

effect on many academic laboratories in the State. A test of anonymous DNA alone,

**does not produce a name,** a social security number, or visible description that can be

used to identify any individual with the naked eye. School Officials can't have it both

ways. If they agree with Brady's reasonable suspicion that the Assistant she reported for

suspicion of neglect, and substance abuse, was indeed the aggressor, then Officials acted

with callous disregard, and retaliatory animus **when they converted a duty to protect**

**Plaintiff, into a pretext to retaliate against Plaintiff in a sham hearing.**

81. On March 10, 2014 Middle School Principal Dana Hilliard knowingly and

intentionally issued Lisa Brady a letter of reprimand, and accused her of

violations under New Hampshire RSA statute from the Office of the Health and

Human Services; *RSA 141 H:2 for genetic testing.* He had <u>no complaining</u> witness,

**and his ONLY evidence was a statement that he wrote up himself.** His letter

stated the following:

> "I am issuing you this letter of reprimand based on your lack of
> professional conduct as demonstrated by your failure to maintain
> proper boundaries, in violation of state law, and its resulting impact on
> our ability to effectively manage the personnel working with our
> students. As you know, **you have admitted that you had the bodily**
> **materials of a paraprofessional subjected to genetic testing.** You
> informed us that you believed that your subordinate engaged in
> inappropriate activity'. Accordingly, **you admitted that you**
> **unilaterally took items that you believed contained the DNA of the**
> **subordinate to undergo genetic testing.** You admitted that you did not
> have the prior Written and informed consent from the paraprofessional
> to have such testing done. Moreover, you have announced to others
> that you had the genetic testing done on the subordinate and have
> repeatedly attempted to announce to others the results of such testing
> without the prior Written and informed consent of the subordinate. As
> such, this conduct, which represents a serious breach of a staff

member's privacy, violates RSA 141 -H: 2. Moreover, your unprofessional conduct has been highly disruptive to our ability to manage the personnel working with and on behalf of our students. As a special education teacher, you are expected to demonstrate effective leadership in your relationships with personnel, whether they be administrators, other teachers or paraprofessionals. Your continued failure to abide by the standards demanded of your profession may lead to your dismissal.

82. An employee terminated due to inefficiency and incompetence, has the right to confront and cross-examine witnesses. See Nevels v. Hanlon, 656 F.2d 373, 376 (8th Cir. 1981). Procedural due process allows an individual the right to *"refute the charges by confronting and cross-examining adverse witnesses."* Id. ***An employer cannot base its decision to discharge an employee on the ex parte communications of a superior.*** Id.  The Somersworth School Board did just that, they based Lisa Brady's termination on ex parte communication of her three superiors; Jeni Mosca, Pam MacDonald, and Dana Hilliard, who were acting in furtherance of a conspiracy to deny Brady her Fourteenth Amendment Rights to procedural due process and Free Speech.

83. When Dana Hilliard issued Brady the written warning, he acted in furtherance of the conspiracy to deny Lisa Brady her First and Fourteenth Constitutional rights to due process.

84. On the same day that Dana Hilliard issued the letter, Lisa Brady sent the following email:

**Subject: False Accusations *Date: Mon, 10 Mar 2014 20:41: 47 -0400* From: Lisa Brady lisa.brady@comcast.net. To: dhilliard@SAU56.ORG, jmosca@sau56.org, ksegal@sau56.org, vhahn@sau56.org, pmacdonald@SAU56.org**

Dear Principal Hilliard,

Additional statements for the record: Excerpts from the reprimand with my responses:

As you know. You have admitted that you had the bodily materials of a para-professional subjected to genetic testing. I have made no such admission. I have admitted that I had two items of my own personal property tested to determine if DNA existed on them other than my own, and if the same DNA were present on both of MY items. **Whose bodily materials were present is purely subject to conjecture** Accordingly, you admitted that you unilaterally took items that you believed contained the DNA of the subordinate to undergo genetic testing Again, the implication here is that I took something that was not mine. **I have repeatedly stated that the items involved were mine.** **Whose DNA I believed to be on them is irrelevant.** Since I was not conducting tests on a person, the requirement to gain permission from these does not exist. The name was listed as unknown. **Moreover, you have announced to others that you had the genetic testing done on the subordinate and have repeatedly attempted to announce to others the results of such testing without the prior written and informed consent of the subordinate. Again, a complete fabrication. I have announced that I had testing done on a cup and a badge, the results of which do not point to any individual. They are anonymous DNA samples some of which match from the coffee cup and badge. The sources from the items is unknown for any scientific or legal purpose.** Most importantly, I sought guidance from Principal Hilliard with regard to DNA testing and had he told me that I it would be ill advised, I would have followed his direction. Principal Hilliard indicated that I announced DNA results of my staff member and this is not truthful. I did not test DNA from a staff member. I had DNA tested on my badge and coffee mug to see if they matched. Of course, I had been handling my badge and my DNA would likely be included within the results. I was comparing the DNA on my property. I did not violate privacy because I listed my name as contact. With regard to speaking and right to my opinion:

☐ I spoke about the issue in mediation, which is confidential.
☐ **I spoke about it at the SAU meeting last week because the mediator, Emily Hayden, had been invited to talk about mediation.**
☐ Additionally, the mediator was not being truthful when she stated that mediation had been a success and we had resolved issue.
☐ I provided you with an email that I had sent to Emily which; directly counters her assertion that our mediation was successful
☐ **If the district did not want to talk about mediation, then why did you invite Emily and open the door for discussion.**

☐ The district has interviewed my staff and has evidence to support
that I did not talk to them about it and that the staff member, in fact is
the one that talked about it.

☐ I didn't tell anyone about DNA testing my badge and cup except
Dana and Elaine A. (in confidence, on the day I was getting frustrated
because Dana had said he would meet with me
and he didn't)

☐ The evidence supports the issues involves my entire class and not
just an issue between the staff member and me.

☐ Dana refused to interview anyone in my classroom and it wasn't
until the complaint went up to the SAU that he even talked to anyone
in my program.

85. Lisa Brady emailed the DNA results to Hilliard, Mosca MacDonald, and Attorney

Kincaid the day before termination.



86.  Lisa Brady had her personal property tested on her personal time, and the test

showed a mixed sample.

87.  Principal Hilliard's testimony below from a January 2019 deposition proved

that his claims against Brady were arbitrary, capricious, and without any

material evidence to support his defamation of character.

**Ms. Brady**:  Did any employee at the middle school complain to you that their
rights were violated by me under RSA 141-H:2?    (Reviewing document.)
**Mr. Hilliard**: No.
**Ms. Brady** Q.   Was I ever given the opportunity to face an accuser with regard to
the claims that I violated DNA laws?
MR. CULLEN:  Objection.  You can answer.
**Mr. Hilliard**: THE WITNESS:  What's that?
MR. CULLEN:  I said "objection," but you can answer.
**Mr. Hilliard**:THE WITNESS:  Do I have to answer that?
MR. CULLEN:  Yeah, if you can answer it, you can.
THE WITNESS:  That she violated --
MR. CULLEN:  No.  Can you repeat the question?
**Ms. Brady** Q.   Was I ever given the opportunity to face the accuser with regard
to the claims that I violated DNA laws
**Mr. Hilliard**:A.  So that's not a straight yes-or-no question, so it's going to be
hard for me to answer that yes or no.
**Ms. Brady** Q.   At the hearing, at my school board hearing, was I ever given the
opportunity to face an accuser for violating the law?
**Mr. Hilliard**:A.   Again, that's not a straight –
**Ms. Brady** Q.   It is.  You either had someone that complained that their rights
were violated or you didn't.
MR. CULLEN:  Well, you had an opportunity to call witnesses.
MS. BRADY:  You do realize that a school board hearing I can't call -- just call
witnesses.
**Continue...Ms. Brady**.   How did you determine that I violated RSA 142 without
a complaining witness or a court finding?
**Mr. Hilliard** Based on your actions.
**Mr. Hilliard** Reprimands are issued to individual staff members based on their
individual actions and violations.
**Ms. Brady** But did you -- did the staff member ever file a complaint that you
were aware of?
**Mr. Hilliard** Not that I'm aware of.
**Ms. Brady** Did you do any kind of investigation before you determined that I
violated RSA 141-H:2?
**Mr. Hilliard**.   All administrators follow the protocol that is set out within -- any
written, verbal or even coaching session is implemented upon a staff member.
The protocol was followed by me as such

**Ms. Brady** And what did -- what did that involve?

**Mr. Hilliard** The protocol was followed by me as such.

**Ms. Brady** Q.   Did you interview anyone on staff?

**Mr. Hilliard** Protocol was followed by me as such as given what I am supposed to do as an administrator   before written, verbal or coaching sessions are issued to any staff members.

**Ms. Brady** Did you interview me?

**Attorney CULLEN:** Did you interview Ms. Brady?

**Mr. Hilliard** THE WITNESS:  I didn't need to interview Ms. Brady.  Ms. Brady came down and admitted that she had, in fact, had DNA testing done on an individual without their compliance.

**Ms. Brady** Q.   Were you aware that I was concerned about safety?

**Mr. Hilliard** You had come to me

**Ms. Brady** With concerns about safety in the classroom.  Were you aware that I DNA-tested my identification badge which had teeth marks in it with dried-up brown saliva

**Mr. Hilliard** A Yes.  I'm aware because you told me that you were going to do that.

**Ms. Brady** What is your experience as a DNA expert to determine unilaterally that I violated RSA 141-H:2 **MR. CULLEN:** Well, objection.  You can answer if you have any DNA expertise.

**Mr. Hilliard**  I have no DNA expertise.  I haven't been trained as an DNA expert.  It's not my educational background

**Ms. Brady** Q.   The reprimand.  Did you consult with anyone with expertise in DNA?

**Mr. Hilliard**  No.  I would not consult with a DNA expert on testing.

**Ms. Brady** Q.   Not on testing.  On -- on what constitutes a violation of DNA.

**Mr. Hilliard**.   Again, the reprimand was -- was issued for not following proper procedure and professional conduct

**Ms. Brady** Q.   But that's not what the reprimand -- the reprimand says that you accused me of violating DNA laws.

**Mr. Hilliard** I've answered the question

**Ms. Brady** MS. BRADY:  I would like to call your attention to -- this is going to be Exhibit 3 (Exhibit 3; so marked.) Exhibit 3, which is a copy of the DNA results that I provided to the school District and dated 1/7/2014 (sic) with the letterhead at top"ANYLABTESTNOW."  If you could turn to the second page of this report.  Under Conclusions, what does it say?

**Mr. Hilliard** A. I'm taking this is the second page, Lisa?

**Ms. Brady** Ms. Brady Q.   Yes.

(Reviewing document.)

**Mr. Hilliard**  What specifically are you asking me?

**Ms. Brady** Q.   I'm asking you what the conclusion was from the report.

**Mr. Hilliard**  I can read it that says, "A mixture of DNA was found on the evidence."

**Ms. Brady** Q.  "A mixture of DNA" would mean more than one person, right?

MR. CULLEN: Objection.  You can answer if you can

**Mr. Hilliard:**A.  I can't answer that because I don't know the base of what the report is

**Ms. Brady** Q.  Okay.  Does the report indicate if it is court admissible?
   (Reviewing document.)

**Ms. Brady** Q. If the report is a mixture of DNA and not Court admissible, would you agree that the results do not provide Sufficient evidence to determine if the DNA belonged to the staff member

Mr. Cullen: objection, but you can answer.

**Mr. Hilliard:**Well, I'm just going to answer as such. I have no other documentation with this report. So I — I have no letter that goes with the report.  I know most reports usually accompany something. I can make no basis of this. I have no way of judging from this report.

**Ms. Brady** Q. How did you know I violated DNA laws?

**Ms. Brady** Q. If you can't make any — decisions or any — comments based on the lack of information in this report, how can you say I violated —

**Mr. Hilliard:**A. You were reprimanded, again for not following proper procedure and protocol in violation of SAU professional standards

**Ms. Brady** Q. Okay. If you believe the staff member's DNA privacy rights were violated, does that mean you believed that the DNA on the badge and cup were exclusively hers?

**Mr. Hilliard:**A. You were reprimanded, again, for not following proper procedures and protocols and professional standards of the District.

**Mr. Hilliard:**A. You were reprimanded, again, for not following proper procedures and protocols and professional standards of the District.

**Ms. Brady** Q. Do you feel I have a right to have that question answered?

**Mr. Hilliard:**A. I feel I've answered it.

**Ms. Brady** Q. You didn't because I asked if you believed that the staff member's DNA privacy right, you accused me of violating her privacy, --

**Mr. Hilliard:**A. I believe —

**Ms. Brady** Q. I'm not done.

**Mr. Hilliard** A. Oh, go ahead. I'm sorry.

**Ms. Brady** Q. If you believed the staff member's DNA rights –DNA privacy rights were violated, it must mean that you believed that the DNA on the and cup were exclusively hers because in order for me to violate her DNA rights, the DNA would have had to have been a match, isn't that correct

**Mr. Hilliard:**A. I believed that you did not follow the proper procedures and protocols and professional standards of sau 56 and were, thus, issued that written warning from me on the date specified as March 10th, 2014, for those documenting reasons as specified within the letter.

47

**Ms. Brady** Q. If the DNA on my mug and badge did belong to my—did belong to my staff member, would my concerns about safety in the classroom been valid?

**Mr. Hilliard:**A. I believe again, that as spelled out within the letter, that you did not follow proper procedures, protocols or adhere to professional standards of SAU 56 and, thus were issued the letter. And that all concerns were raised by you and by any other member of the faculty during that time period or to current date are always adhered to and followed by the administrators and the procedures that we need to follow I order to investigate.

**Ms. Brady** Q. If the DNA on my mug and badge did belong to the staff member—well, sorry. Strike that. Were you aware at the time that I had significant concerns about my classroom safety related to the staff member's admitted use of Oxycontin to me and falling asleep while working with nonverbal autistic students

**Mr. Hilliard:**A. I can recall you coming to me and voicing some concerns about that staff member and, again, all procedures were followed as far as any investigation that needed to occur by both myself and the assistant principal during that time. Kate Segal.

**Ms. Brady** Q. What proof did you have at the time you issued the March 10th letter that I violated RSA 141-H2?

**Mr. Hilliard:**A. Based on specifically what is spelled with that letter of reprimand that you were handed. I think it's quite—

**Ms. Brady** Q. That's the only thing you used?

**Mr. Hilliard:**A. I think it's -- I think it's quite clear in what—in what I specified, so I will go to- again, I will go to what is specified with the March 10th letter, that you did not follow proper procedures or protocol and, thus, were issued a written reprimand.

**Ms. Brady** Q. And that was your only proof?

**Mr. Hilliard:**A. I will go to what is issued within the March 10th letter is specifically spelled out in that reprimand.

**Ms. Brady** Q. Okay, knowing that I disagreed with the facts you wrote in the March 10th letter of reprimand, why didn't it change your finding that I violated RSA 141 H-2?

A. Proper procedures were followed as always, an issue in any reprimand. I will stand by the wording and what is written in the March 10th, 2014, reprimand.

88.  The Somersworth School Board also stated the following:

"Ms. Brady violated policy GBEA, the Staff Ethics Policy, particularly the last two bulleted sections when she sought to use bodily fluids to tie the staff member to suspected conduct involving Ms. Brady's cabinet and I.D. badge. In the view of the Board, this behavior ***contributed to such a breakdown of trust and confidence between supervisor and subordinate*** that the Superintendent had no choice but to separate and

48

transfer Ms. Brady and the staff member in the manner she saw fit. It is apparent that the decision was not only rejected by Ms. Brady but served as fuel for her campaign to tie the offending administrators to alleged but unsubstantiated crimes and misdemeanors"

89. Lisa Brady had <u>no supervisory power</u> over he assistant, if she did, she would have placed her elsewhere in the building.  Assistant Principal Kate Segal and Principal Dana Hilliard were the assistant's supervisor.

90. Superintendent Jeni Mosca did not have a right to transfer Lisa Brady, she defied the Collective Bargaining Agreement because she was not allowed to demote her, and the following screen shot, taken during the time frame of the transfer, showed that Brady was demoted from a General Education Teacher to a Paraeducator II.



91. <u>**On May 23, 2016**</u> the Somersworth Defendants admitted the following:

"Defendants deny that Superintendent Mosca breached the Plaintiff's contract by transferring her within the School District.  **Defendants admit that they created a temporary position for the Plaintiff at Maplewood in anticipation of an opening the following school year.** Defendants admit that a third-grade mentor position for the following

year had accidently been placed in the Plaintiff's personnel file while the file was being copied at her request and was removed, likewise at her request." See U.S. District Court of N.H. Lisa Marie Brady v. School Board, Somersworth School District (SAU #56), et al. doc. 14, Civil Action No. 16-CV-00069-JD.

92. Material evidence from the Department of Education website proved Brady was demoted, and no position was available. Under Article 6 of the CBA, it stated:

"No teacher with continuing contract status shall be nonrenewed, suspended, **reduced in rank** or compensation **without a due process hearing before the Board** under the guidelines established by appropriate state laws. All information forming the basis for such action shall be made known to the teacher prior to such hearing."

## SOMERSWORTH CULTURE AND CLIMATE OF BULLYING

93. The Somersworth School District and bullying administrators is nothing new, the same culture and climate went on through Brady's employment. As one former Special Education teacher from Somersworth High School, Lisa Payeur posted on a public website:

"I have recently been made aware of Lisa Brady's contribution to your site, including the unstated use of Facilitated Communication in a video of a student, and her subsequent dismissal from her Special Education position in SAU 56, when she brought the issue to the attention of administrators, and others involved in making the film. I have three statements regarding this incident: 1. Lisa is a respected professional in her field, and has always advocated for students, families, and staff in very appropriate manners, facts, and interest in student rights and needs. I have no doubt that she is accurate in assessing what was the child's performance level. 2. As one of the first handful of special educators to include students with disabilties into regular schools, and classrooms in NH, I have had past experience with the Institute on Disability. As long as I went along with their tactics, I was highly regarded. When I questioned efficacy or the manner in which students were portrayed, I was

shunned. It's a fact that Facilitated Communication has been disproven in several studies. It's a fact that some early manuals put out by the IOD that focused on my students contained false information about student abilities and friendships. It's a fact that a book was published which referred to one of my students, again portraying inaccurate abilities. Further, it's a fact that when I was consulting in a school district that was ready to initiate inclusion, one of my former students was portrayed as having moved up to the fifth grade, when in actuality, he was medically fragile and had to be removed from school near the end of third grade and then was placed in a pediatric nursing home. The IOD presenter, seeing me there, came to me after and requested I not share the information. I would not characterize the tactics as being endorsed by all those at the IOD, but there have definitely been incidents where student abilities were knowingly misportrayed. 3. **Having worked in the Somersworth School District during the reign of Pam McDonald as Special Education Director, I would like to just mention that several of us on her staff were treated with disdain, were unfairly moved to new positions if she had issues with us, or were forced into medical leave and disability, or were fired. If someone were to check the numbers between 2011 and 2018, when she left, they would be surprised at the number of reassignments, firings, and medical leaves that occurred. Appealing to Jeni Mosca, Superintendent, was a waste of time. She worked hand-in-hand with McDonald, and in my case and two others, the principal did as well.**

These people caused me so much distress that I didn't even have the emotional strength left to file a suit. I know some others who felt the same. So again, I totally back Lisa Brady on this issue. And the fact that state monies were used in that misportrayal of a student, is deplorable. See https://granitegrok.com/blog/2015/04/autism-specialist-implicates-somersworth-sau56-and-unh-in-fraud downloaded 8/3/2024.

94. On June 16, 2023 the Foster's Daily Democrat printed a news story about

Somersworth School District's Dana Hilliard, and it stated in part the following:

"SOMERSWORTH — Investigations into Lori Lane and Dana Hilliard — the two top administrators of the city's schools — reveal damning allegations of verbally abusive and demeaning behavior toward school building administrators and staff. Both were recently

51

placed on paid leave." <u>Karen Dandurant</u> Fosters Daily Democrat
Published 5:16 a.m. ET June 16, 2023.

95. The Somersworth School Board, Jeni Mosca, Pam MacDonald, and Dana
Hilliard acted in furtherance of a conspiracy, under color of law when they
communicated **orally and in** writing a statement that they knew to be false that
**Lisa Brady** violated N.H. Rev. Stat. § 141-H:2, AND when they violated Articles of
the N.H. State Constitutional Article at. **[Art.] 2-b. [Right of Privacy.]  Art.] 2-b. [Right
of Privacy.]  [Art.] 20. [Jury Trial in Civil Causes.] and [Art.] 2. [Natural Rights.]**
and **Universal Citation. They also** NH Rev Stat § 638:2 (2015) by knowingly falsifying
and concealing material verbal and written or evidence for which the law provides public
recording.

96. Jeni Mosca, Pam MacDonald, and Dana Hilliard's actions were motivated by an
intent to constitutionally harm Brady by denying her fair procedural due
process and free speech under the First and Fourteenth Amendments. They did
so to protect their criminal involvement with aiding and abetting UNH IOD and
Dan Habib's fraudulent Film, "Axel," which; used public grant funds to make
false claims.  An ongoing federal wire fraud.

**ATTORNEY JEANNE KINIAD**

97. Somersworth School Board Hearing on February 16, 2015, at City Hall, at
5:30pm: Attorney Jeanne Kincaid testified at a Somersworth School Board
Hearing, open to the public and stated the following, in part:

> "She is alleging and she submit that it is not crystal clear what she
> alleging and what I think she is alleging on January 12 2015
> superintendent Mosca testified before you and Mr. Hilliard testified

before you and I prosecuted the case, you know now that Ms. Brady dropped her claim against Mr. Hilliard, the claim rests against Superintendent Mosca for falsely testifying and violating all kinds of torte laws, privacy laws and reputational laws and were both guilty according to Ms. Brady of class B felonies because of this. She stated that we are here as a grievance violation of the CBA, this is not retrying the three-night hearing."

She also stated the following:

If you turn to RSA 141 H2 which you found she violated it says there are a number of exceptions **not an issue here** it says no genetic testing will be done in this state on any individual **that would include a subordinate** that **you supervise** or anyone on anyone in this state based on bodily fluids which saliva would be a bodily fluid obtained in this state **which this happened in your school** **without prior written and confirmed** consent of **the individual to be tested** and of course that was not done and the results **can't be released without the expressed written consent of the person tested**. She stated that you all made that finding on January 20th and it is very consistent with this law, that document that you are seeing tonight should not alter the opinion you made on January 20th . She stated that the essence of the complaint as I understand it is that Superintendent Mosca would **not have testified on a truism**. **There is no dispute that Ms. Brady took DNA from a subordinate and had it tested without knowledge of effort.** These facts are not in dispute so how could Superintendent Mosca have falsely done anything because this evidence was testified to by Ms. Brady so her underlying thesis is that the Superintendent falsely accused her is a lie by her own statements in evidence. She stated and again an absolute finding you made on January 20th. See Ex.9 p.

98. See email from page 30 above, and note that Jeanne Kincaid was also given a

copy of the DNA report.

99. Jean Kincaid knew all of the following "refuted" her claims:

A. Brady tested her private property on her personal time, and the law did not

require consent.

B. There was no school board policy that would have disallowed the test.

C. Brady did not "take" the assistants bodily fluids; she took <u>anonymous and abandoned</u> DNA from her personal property after a threat went uninvestigated, and was minimized by Principal Hilliard. Brady's file cabinet had been kicked in, and her identification badge, had been left on her desk, with visible teeth mark impressions and a dried up wad of brown saliva.

D. The DNA test was <u>not court admissible</u> because there was no chain of custody, it was not dispositive.

E. The DNA from her private property was a "*mixed*" sample. See page 30 above.

F. The DNA test did not identify a name on the mug and badge. See page 30 above.

G. Attorney Kincaid also reasonably should have known that the only way for Lisa Brady to confirm the saliva belonged to the assistant was by pursuing a legal DNA specimen with cooperation from the assistant for comparison, one that would have required informed consent.

H. The Somersworth School District <u>did not provide any material evidence</u> to prove Brady committed a "knowing" violation of the prohibited "taking" or "obtaining" of DNA from her assistant.

100. In her closing argument Attorney Kincaid stated:

"I point out one final point, which, again, Ms. Hiller who -- I am giving you a lot of compliments. I know you are the newest school board member. And she really has read the record. She really did. She kind of stole my thunder on the

closing argument because she already said it could have been the janitor."
Termination Hearing Transcript

101.    If it had been the janitor's bodily fluids, that then would "dispute"

Kincaid's claim:

> *"That Superintendent Mosca would __not have testified on a__
> __truism. There is no dispute that Ms. Brady took DNA from a__
> __subordinate and had it tested without knowledge of effort."__*

102. The New Hampshire Rules of Criminal, Fraudulent and Prohibited

Transactions [9] Paragraph (d) prohibits a lawyer from knowingly counseling or

assisting a client to commit a crime or fraud. See

https://www.courts.nh.gov/new-hampshire-rules-professional-conduct.  Jeanne

Kincaid assisted her clients, the Somersworth School Administrators Mosca,

MacDonald, and Hilliard, of the crime of aiding and abetting fraud.

 Attorney Jeanne Kincaid acted in furtherance of a conspiracy, under color of state

law, when she asserted that Lisa Brady violated the law under N.H. Rev. Stat. §

141-H:2 when she knew Brady had not been afforded due process for those

claims in any court in the state of New Hampshire, and violated Brady's rights

under Articles of the N.H.  State Constitution at. **[Art.] 2-b. [Right of Privacy.]  Art.]**

**2-b. [Right of Privacy.]  [Art.] 20. [Jury Trial in Civil Causes.] and [Art.] 2. [Natural**

**Rights.] and Universal Citation. She also violated** NH Rev Stat § 638:2 (2015) by

knowingly falsifying and concealing material verbal and written or evidence for which

the law provides public recording at her School district hearings, and the department of

labor.  She knowingly assisted the Somersworth School District Administrators;

Mosca, MacDonald, and Hilliard in constitutionally harming Brady, denying her

substantive and procedural due process and free speech under the First and

Fourteenth Amendments. She did so to silence Brady and to aid and abet UNH

IOD, and Dan Habib's fraudulent, 'Axel,' film.

**NH NEA CONFLICT OF INTEREST**

103. The Who Cares About Kelsey Teaching Kit included "Axel" mini film.

Funders of the project included:

**Lead Funders**

- Endowment for Health
- New Hampshire Charitable Foundation
- **New Hampshire Department of Education**

**Major Funders**

- A.J. Pappanikou Center for Excellence in Developmental Disabilities, University of Connecticut
- American Federation of Teachers
- Fledgling Fund
- **National Education Association**
- Strong Center for Developmental Disabilities, University of Rochester

**Additional Funders**

- Crotched Mountain Foundation
- Easter Seals New Hampshire
- Episcopal Bishop of New Hampshire
- National Youth Transitions Center and Youth Transitions Collaborative
- Jay Nolan Community Services
- Lincoln Financial Foundation
- Mitsubishi Electric America Foundation
- National Association of School Psychologists
- New Hampshire Association of Special Education Administrators  see: https://iod.unh.edu/who-cares-about-kelsey

104. The **New Hampshire Department of Education were lead funders,** and the

**National Education Association  (NH-NEA) were considered major funders** of

Dan Habib's IOD film project. They both had conflicts of interest that they **never disclosed to Lisa Brady**.

105.**In 2012**, the same year that "Axel" was filmed, the NEA-NH awarded Dan Habib the "Champion of Human and Civil Rights Award." Down loaded 7-11-2023, See: (https://iod.unh.edu/blog/2015/02/dan-habib-wins-university-michigan-humanitarian-service-award). The NH-NEA had a further conflict of interest in protecting Dan Habib, and their investment in his reputation.

*106.* Lisa Brady's contract bargaining agreement (CBA hereafter), under article 5 stipulated an agreement between the Somersworth School Board and the Association and a commitment to adhere to RSA 273-A (Public Employee Labor Relations). The NH NEA took Brady's union due and breached a duty to represent her throughout her unlawful transfer and termination hearing. All of the procedural allegations with regard to Brady's wrongful termination, as outlined in more detail above.

107.The following emails were sent by Brady, soliciting support:

From: Lisa Brady
To: "pmiller@nhnea.org" , Lisa Brady
Date: November 25, 2014 at 2:08 PM
Subject: Representation
Hi Peter,
I am wondering if the NEA attorney can get me my job back since I was
falsely accused of violating a law. Also, because the superintendent
submitted it to the Department of Labor, it is considered libelous
defamation of character.
Two criminal attorney's that I consulted with laughed when they saw the
letter that Dana Hilliard wrote to me on March 10, 2014, transferring me
to Maplewood. They misinterpreted the law and I did not break any
school board policy or law when I had my personal property DNA tested.

Dana did violate school board policy when he did not investigate my claims of vandalism and harassment (My subordinate bit my badge). They also demoted me and violated the terms of the CBA and I want my job back. Can you help?
Lisa

**From:** lisa.brady@comcast.net [mailto:lisa.brady@comcast.net]
**Sent:** Friday, March 27, 2015 4:48 PM
**To:** Steve Sacks
**Cc:** Rick Trombly; Ed Olson; Peter Miller
**Subject:** Request for representation
 Dear  Attorney Sacks,
I am writing to request representation with Arbitration or with the NH DOE for wrongful termination; whistleblowing and breach of contract.
I have sent you evidence which, clearly supports my position with regard to a legal defense. I paid union dues for 7 and half years and I deserve to be treated with fairness and without discrimination.
Please let me know your position,
Lisa Brady, M.Ed.
Autism Specialist

108. The National Education Association (NEA) failed to assist Lisa Brady under

a contractual agreement that ensured "No employee shall be disciplined without just

cause." The NEA refused to represent Brady at her termination hearing, and

refused to appeal her termination through arbitration. See Exhibit #10, p.143-144.

Brady worked for the Somersworth School District for 7.5 years, was a tenured

teacher, with excellent teaching evaluations, and a fully compliant due paying

member with the NH NEA. The NEA's choice to deny Brady representation was

made in bad faith, they breached a duty of fair representation.

109. Lisa Brady sent the following email to NEA Attorneys twelve days before the

NH-NEA sent her a letter refusing to allow her to arbitration.

> **From:** "Lisa Brady" <lisa.brady@comcast.net>**To:** ssacks@nhnea.org
> <SSacks@nhnea.org>, pmiller@nhnea.org, eolson@sau56.org,

"Angela Ficco" <aFicco@sau56.org>, "Ginnyandheather"
<ginnyandheather@myfairpoint.net>, "Scott McGilvray"
<smcgilvray@nhnea.org>, "Rick Trombly" <rtrombly@nhnea.org>,
"Esther Dickinson" <edickinson@nhnea.org>, "Lisa Brady"
<lisa.brady@comcast.net>
**Sent:** Sunday, June 14, 2015 10:53:40 PM **Subject:** Insubordination
Dear Attorney Sacks,
I just came across some case law with regard to insubordination that
I thought I would share.  I have been bothered by the NH NEA's
position, agreeing with allegations that I was acting in an
'insubordinate manner, when I continued to send e-mails to the press
after being ordered to stop by the Superintendent.  Her motivation to
want to stop me from reporting her criminal offenses to the press is
human nature and makes sense if you want to get away with
exploiting a child.  The laws however; support that I had the right to
continue to advocate on behalf of my former student, Axel, who is
the victim of a crime.  The superintendent wanted to condition my
employment on discrimination.
See:  http://www.eeoc.gov/policy/docs/retal.html
*Refusal to obey an order also constitutes protected opposition if the*
*individual reasonably believes that the order makes discrimination*
*a term or condition of employment.*
You may not agree but, I did have the right to continue to email
about the fraudulent video.  Sincerely, Lisa Brady

110. Under NH Rev Stat §189:13 provides that in order to dismiss a tenured teacher

before the end of contract is to prove that a teacher is *incompetent, immoral, and*

*does not prescribe to regulations*. The NH NEA stated the following in an email to

Lisa Brady five days before the Somersworth School District terminated her

employment:

From: Peter Miller
Sent: Thursday, January 15, 2015 10:38 AM
To: Lisa Brady; Jim Allmendinger
Subject: RE: Law
Hi Lisa-
I'll speak to Jim about your request, but in the immediate term you
can point out a couple things relative- to the district's statement that
you violated the law.

**1.They did not call the police. If they thought you had committed a crime, why didn't they call the police? Does the administration typically brush serious legal violations (which they're claiming the DNA test was) under the carpet?**

2.No court or review board determined that you violated the law, The administration's lawyer is asking the *school board to accept Atty. Kincaid's opinion as a decision rendered by the justice system.* The school board should take Atty. Kincaid's opinion for what it is, an opinion from an attorney who's trying to dismiss a teacher. I think that at the Dept. of Labor you'll have a hearing officer who will be open to the above observations.
-Peter –
**Peter Miller, Eastern Region UniServ Director**
**NEA New Hampshire**
8 Portland Avenue
Dover, NH 03820

(603) 953-0088 (ofc) / (603) 953-0092 (fax) / **(603) 617-8140 (cell)** / (866) 556-3264 (toll-free)

111. Peter Miller's email was sent five days before Lisa Brady was terminated from Somersworth. His email shows that the NH-NEA knew or should have known that the DNA charges were without merit.  If the Union had attended the Hearing and expressed the views within Peter Miiller's email, as stated above, it would have made a difference.  The Union knew that their assistance would have helped but, they wanted to protect the film package that they helped fund.

Who Cares About Kelsey Teaching Kit included "Axel" mini film
**Major Funders**

- A.J. Pappanikou Center for Excellence in Developmental Disabilities, University of Connecticut
- American Federation of Teachers
- Fledgling Fund
- **National Education Association**
- Strong Center for Developmental Disabilities, University of Rochester
  https://iod.unh.edu/who-cares-about-kelsey

60

112. The NH-NEA acted in furtherance of a conspiracy, under color of state law, when they breeched a duty to fair representation. They intentionally turned a blind eye to the retaliation that Lisa Brady suffered, at the hands of Somersworth School Officials, and acted with deliberate indifference to any responsibility that may have had to help her secure constitutionally fair procedural due process under the Fourteenth Amendment, and free speech under the First Amendment to the U.S. and New Hampshire State Constitutional Articles at. **[Art.] 2-b. [Right of Privacy.]  Art.] 2-b. [Right of Privacy.]  [Art.] 20. [Jury Trial in Civil Causes.] and [Art.] 2. [Natural Rights.]** and **Universal Citation. They also** NH Rev Stat § 638:2 (2015) by knowingly falsifying and concealing material verbal and written or evidence for which the law provides public recording. They did so, to silence Brady and to aid and abet UNH IOD, and Dan Habib's fraudulent, 'Axel,' film.

The "Axel" film is still selling online to the public from $4.99 (to rent) to $295.00 for a college streaming license. https://likerightnowfilms.com/shop. It continues to violate laws for federal wire fraud without legal sanctions of any kind. See 18 U.S.C.134.  The NH-NEA continues to enjoy their affiliation with the film.

## NH DEPARTMENT OF EDUCATION

113.        **On July 11, 2014** New Hampshire Commissioner of Education Virginia Barry received a complaint from Lisa Brady that stated the following:

"**Subject:**        Complaint

- I attempted to establish a meeting to try to change the student's IEP by putting the student back on an Alternative Assessment.
- When educational records were sent up to the middle school, there were recent evaluations to support that the student was significantly impaired.
- The student did not turn in an alternative portfolio as required in the spring of 2012 and reasoned that Michael McSheehan from the Institute of disability and consultant with NHDOE in the area of alternative portfolios, recommended that he take the NECAPS.
- Director MacDonald stalled my attempts to set up a meeting.
- I communicated with AC's parent and they said that they have tried to do facilitated communication and AC never wrote anything and they didn't believe it.  They also agreed that AC was functioning at a much lower level than what the Idlehurst team had claimed.

- I filed a grievance against Director MacDonald in September 2012 and noted my fear of retaliation.
- Given that the student's plan did not indicate that facilitated communication was an accommodation, the middle school did not Removed Information
- In March 2013 I was retaliated against by Director MacDonald, entering false allegations into my employment file.
- I entered a rebuttal to the false allegations and once again noted my fear of retaliation.
- The Institute of Disability did not produce AC's video or use it until this past February 2014 and, once again, I was retaliated against with false information entered into my employee file and a forced to leave my job at the middle school and sent to Maplewood and had I not hired attorney's at Bianco Professional Associates, I have no doubt the Superintendent would have fired me.
-  My attorney's are currently in the process of filing a whistleblowers suit and I want my job back at the middle school.
- I would welcome you to contact my attorney's because, as you can imagine, there are many factors involved with this case.

**Summary of the past five IEP's for the Student Student's (taken from one of my grievance letters to the district)**

| IEP Date | Primary Coding | Excerpt about Development | Describe why student cannot take regular assessment. |
|---|---|---|---|
| | | | |

| 12/12/2008 | Mental Retardation/ Autism | Math Present Level: Student can count to two while engaging in a movement activity. | "Student has a limited vocabulary and is not yet able to read. The regular assessment is not appropriate to accurately measure Student's abilities and his degree of progress." |
|---|---|---|---|
| 12/18/2009 | Mental Retardation/ Autism | Speech:  Present Level: "significant delays in all academic areas and is presently working on pre-academic and functional skills." | Student's communication style has made it difficult to assess his current cognitive level of function and adaptive behavioral skills are significantly below grade level. He is receiving systematic instruction with tasks in small steps and requires a 1:1 support person at all times for all tasks |
| 12/12/2010 | Mental Retardation/ Autism | Able to recognize and match a variety of pictures | The computer based MAPS testing is not an appropriate method of measuring Student's academic growth. Student is non-verbal and a non-reader who requires maximum assistance in all areas of academics and life skills |
| 12/12/2011 ***** The Idlehurst Team Was obligated to complete an alternative assessment! | Autism | Student is functioning in the skill level of a three year old with some aspects of his self-help such as toileting and cutting food. | (a) Describe why student cannot take regular assessment. Student's communication style has made it difficult to assess his current cognitive level of function and adaptive behavioral skills are significantly below grade level. He is receiving systematic instruction with tasks in small steps and requires a 1:1 support person at all times for all tasks. |
| 05/24/2012 After the Window Of Testing: Oct. 2011- May 5, 2012 | Autism | He requires information to be read aloud to him, but performs most grade-level tasks proficiently with generous support | Entered  NECAP testing in IEP |

http://www.whocaresaboutkelsey.com/about/the-mini-films
Axel is a fifth grader with autism who is non-verbal and exhibits significant behavioral challenges. Through effective communication supports, Axel was able to learn fifth grade general education curriculum in a general education classroom. Support for this film was provided by the National Center and State Collaborative.

64

Please investigate this issue.  My attorneys can be reached at the number below.
Sincerely, Lisa Brady, M.Ed.
Jim Bianco, Esquire, Christina Ferrari, Esquire. Bianco Professional Association,
Attorneys at  Law 18 Centre Street Concord, NH 03301 Phone: (603) 225-7170
Fax: (603) 226-0165_ cferrari@biancopa.com www.biancopa.com"

114.    In September of 2014 Lisa Brady inquired about her complaint to Barry
and stated:

"Subject: Grant Fraud
From: Lisa Brady <lisa.brady@comcast.net>
Date: 9/17/2014 7:32 AM
To: "Barry, Virginia" <Virginia.Barry@doe.nh.gov>, Jim Bianco
<jbianco@biancopa.com>, attorneygeneral@doj.nh.gov

Dear Commissioner Barry,

My involuntary transfer from Somersworth middle School to Maple Wood
Elementary was directly related to my advocacy for my special education
student which, resulted in a subsequent pattern of retaliation that began in
September 2012 and culminated in an illegal transfer from Somersworth Middle
School to Maple Wood Elementary School last March. I have previously written a
complaint with regard to Jeni Mosca and Pam MacDonald and their part, with
regard to their involvement in a grant fraud, and a film produced by Dan Habib
with help from Michael MacSheehan from the NH Institute of Disability. What
they do not state in the film is that all their opinions were validated using a sole
criteria of evaluation; facilitated communication. FC is an experimental
procedure that is not recommended by any governing professional board
because of the lack of science supporting its' use and because situations like the
current predicament with Axel should not ever occur. A's file contains
evaluations from professionals which; detail his long-standing significant
cognitive deficits. He has not mastered letter or number recognition. They claim
he is college bound for the good of the film and their personal gains. Jeni Mosca
and Pam MacDonald had knowledge when I complained back in 2012. If they
disagreed with my opinion then they should have had his language tested as I
requested back in September of 2012. Also if they believed that I was wrong they
were obligated to have him tested because I educated him like a pre-school child
and not on grade level. Either way they were obligated to test him and instead
set out to destroy my career and take away my passion......teaching students with
Autism. They have successfully bullied me
and I have given up any hope of getting my job back. I feel like they have
destroyed a part of me; I woke up everyday with enthusiasm to teach the

students that most teachers don't want, don't know how, or just don't have the
time to teach with the kind of passion that I had for my job.
I have a huge file of evidence to support that I was bullied and retaliated against.
**I am wondering how the investigation into my allegations of grant fraud are
going.**
I will be more than willing to sit down with you and show you all the records
which, document their illegal behavior.
Sincerely,
Lisa Brady
8 Constable Road
Durham, NH 03824
603-292-5052"

115. Eight days before Virginia Barry issued her complaint investigation report,

Lisa Brady sent NH DOE complaint investigator Richard Farrell the following

email (only 2 of several emails):

To: richard.farrell@doe.nh.gov, Lisa Brady lisa.brady@comcast.net
Date: 11/5/2014 12:59 PM

Dear Mr. Farrell,
I wanted to clarify even further that by final production, I mean selling the
Kelsey teaching package, for profit, at the Institute of Disability. From September
2012 until it was offered for sale in approximately, Feb. or March of this past
year, they made no attempt to correct the record i.e. test Axel, recommend not
letting it go to final production etc. Instead, they spent that time placing false
allegations in my file and making my life very difficult. They knowingly
committed fraud, falsification in public matters, and abuse of office.
Additionally, the retaliation that I experienced from Superintendent Mosca and
Pam MacDonald would fall under bullying, and abuse of office. They knowingly
placed false allegations in my employment file for the purpose of humiliating
and punishing me for filing a grievance against Pam MacDonald in September of
2012 with regard to the false portrayal of Axel and violations with his IEP.
Thanks again, Lisa Brady

116. **Also See the following email sent to Mr. Farrell the following day:**

**Subject:** Axel video **From:** Lisa Brady lisa.brady@comcast.net  **Date:** 11/6/2014
9:39 AM
**To:** Richard.farrell@doe.nh.gov, Lisa Bradylisa.brady@comcast.net

66

Dear Mr. Farrell,

I wanted to call your attention to the Axel video and if you pause at the following times, you gain some real insight into the ridiculous assertions claimed by Idlehurst and Michael McSheehan.

Axel Video: pause the video at the following times:

- 1 minute 43 seconds  Special Ed. Teacher Deb Mitchell talks about Axel's IEP (which was still current) from Rochesterand details the low functioning goals in his IEP
    - 3 minute 10 seconds  The Paraprofessional is using facilitated communication and it shows Axel uninterested, passive, and playing with a sentence strip. **Something we stopped immediately at the middle school.
    - 3 minute 22 seconds   A student was mimicking the adults and appears to be using FC with Axel.
    - 7 minute 07 seconds to 8 minute 22 seconds-Michael McSheehan's body language towards the family speaks volumes; he attends nicely to Bethany and turns away from the family. He only gives them contact at the end of the meeting.
    - 10 minutes and 38 seconds to 11 minutes: Axel's Para is very intense doing fifth grade work and Axel is looking away playing with his sentence strip. If you continue to watch the video transitions back to what supposedly was Axel's work (behind the plastic bin)
    - 12 minute 05 seconds The student is using FC with Axel.....Was she trained??
    - 12 minute 45 seconds---Michael McSheehan mentions that adults are stabilizing him

When the Idlehurst team came over to the middle school to demonstrate how they used facilitated communication with Axel, I asked them why Axel wasn't even looking at the paper when he wrote and how could he know when to move his hand down to the next line on the paper. There is no way Michael McSheehan could not know that Axel was not authoring the work. Thanks for your time, Lisa Brady

117. Commissioner Virginia Barry responded to Brady's July 11, 2014 complaint

nearly six months after it was filed and failed to answer any of the claims.

Instead, she answered a complaint that was never lodged. ***Commissioner Barry***

***had notice of fraud, was in a position to correct the action,*** and ***she was***

*deliberately indifferent' to her unlawful conduct when she failed to address the*

*actual complaint issues.* See Gebser v. Lago Vista Independent School District, 524

U.S. 274 (1998).



See photo at: https://www.youtube.com/watch?v=iG2E6Wv21Fs
Former N.H. Commissioner Virginia Barry Pictured above, has never been held accountable for
her part in Federal Wire Fraud.



Virginia M. Barry, Ph.D.
Commissioner of Education
Tel. 603-271-3144

Paul K. Leather
Deputy Commissioner of Education
Tel. 603-271-3801

STATE OF NEW HAMPSHIRE
DEPARTMENT OF EDUCATION
101 Pleasant Street
Concord, N.H. 03301
FAX 603-271-1953
Citizens Services Line 1-800-339-9900

November 13, 2014

Lisa Brady
8 Constable Road
Dunham, NH  03824

Dear Ms. Brady,

The New Hampshire Department of Education received your complaint dated October 14, 2014 of
education grant fraud against the Institute of Disability for the film project *Education Revolution:  The
Inclusion of Students with Emotional/Behavioral Challenges.* The New Hampshire Department of
Education provided funding for this film project through the Governor and Council process.  The Institute
of Disability submitted invoices regarding the amount for reimbursement as well as description of the
costs.

Upon review of the documentation submitted by the Institute of Disability, the New Hampshire
Department of Education has concluded that the grant money was used and reimbursed appropriately.
Therefore, the New Hampshire Department of Education has concluded that this complaint is unfounded.

Sincerely,

Virginia M. Barry

Virginia M. Barry, Ph.D.
Commissioner of Education

VB/st

118.

68

Virginia Barry and Richard Farrell Intentionally suppressed material **evidence,** and denied Brady's right to due process and free speech. In doing so they violated the law, N.H. Title LXII, 641:6 **Falsifying Physical Evidence II, and 641:7 Tampering with Public Records** or Information. They also violated Articles of the N.H. State Constitutional Article at. **[Art.] 2-b. [Right of Privacy.] Art.] 2-b. [Right of Privacy.] [Art.] 20. [Jury Trial in Civil Causes.] and [Art.] 2. [Natural Rights.].** They violated NH Rev Stat § 638:2 (2015) by knowingly falsifying and concealing material verbal and written or evidence for which the law provides public recording. A federal wire fraud.

119.    They knowingly reported complaint findings they knew were false to avoid answering Brady's valid complaint about the Axel film. They turned a blind eye, and acted with deliberate indifference to a duty they had with oversight on monitoring. They tampered with public records, by knowingly entering a false complaint finding on claims never filed. Barry and Farrell acted individually and in concert, to deprive Lisa Brady of the benefit of presenting "fair" findings of facts that would have aided her defense at termination. They acted in furtherance of a conspiracy, under color of state law, to constitutionally harm Brady, denying her free speech and procedural due process under the First and Fourteenth Amendments. They did so to silence Brady and to aid and abet the fraudulent, 'Axel,' film, part of the Who Cares about Kelsey teaching kit, sponsored by the State of N.H. and Federal grant funding.

120. Had the N.H. Department of Ed. investigated the actual allegations lodged

by Brady, in compliance with N.H. Code of Admin. R. Ed 511.01, Mosca and

MacDonald would have been the ones subjected to discipline:

> "Ed 511.01 **(2)** If the investigation finds a credential holder in
> violation of a rule of the code of conduct as specified in Ed 510.01
> through Ed 510.04, the department shall propose a form of discipline
> as follows: **a.** Suspension; **b.** Revocation; or**c.** Reprimand; and" N.H.
> Code Admin. R. Ed 511.01

121. When Virginia Barry and Investigator Farrell reported findings on a

complaint that Brady did not file, they showed an *'affirmative link,'* or intent to

conspire with the University of New Hampshire IOD staff and the Somersworth

Administrators, Jeni Mosca, and Pam MacDonald.

> "A supervisor may not be held liable for the constitutional violations
> committed by his or her subordinates, unless there is an 'affirmative
> link' between the behavior of a subordinate and the action or
> inaction of his supervisor such that the supervisor's conduct led
> inexorably to the constitutional violation." See Soto-Torres v.
> Fraticelli, 654 F.3d 153, 158 (1st Cir. 2011)

## UNH INSTITUTE ON DISABILITY

122. The Axel film was a grant funded project sponsored by the National

Center and State Collaborative (NCSC) through the Office of Special Education

Programs (OSEP) in the U.S. Department of Education. *The purpose of the grant*

*was **to develop an alternate assessment system** and related content to assess the*

*English Language Arts and Mathematics achievement of students with the most*

*significant cognitive disabilities.* It is ironic given the description of the purpose of

the grant, that UNH IOD, through Michael ***McSheehan, used facilitated***

70

*communication as the only means to determine that Axel no longer met*

*eligibility to participate in the alternative assessment.*  Axel's fifth grade

special education teacher, Deb Mitchell, also featured within the film, sent

the following email to Lisa Brady.

> "From: Deborah Mitchell Sent: Friday, March 29, 2013 12:03P M
> To: MichaelQuigley; LisaBrady; DanaHilliard Subject: RE: A.C.
> Scores
> Hi Lisa, It was great to see you. Thanks for stopping by. As I told
> you when you were here all of A's information was sent to the
> middle school with his special ed files. Per **Michael McShehans** and
> Laurie Lamberts suggestion <u>we withdrew A from the alt last year</u>
> <u>and did not send in an alt portfolio with the anticipation</u> of him
> testing with the regular assessment in 6th grade. Thanks, Deb"

123. Who Cares About Kelsey?  The teaching kit included the "Axel" mini film.

U.N.H. and N.H. Department of Education had conflicts of interest.

**Lead Funders**

- Endowment for Health
- New Hampshire Charitable Foundation
- **New Hampshire Department of Education**

**Major Funders**

- A.J. Pappanikou Center for Excellence in Developmental Disabilities, University of Connecticut
- American Federation of Teachers
- Fledgling Fund
- **National Education Association**
- Strong Center for Developmental Disabilities, University of Rochester

**Additional Funders**

- Crotched Mountain Foundation
- Easter Seals New Hampshire
- Episcopal Bishop of New Hampshire
- National Youth Transitions Center and Youth Transitions Collaborative

71

- Jay Nolan Community Services
- Lincoln Financial Foundation
- Mitsubishi Electric America Foundation
- National Association of School Psychologists
- New Hampshire Association of Special Education Administrators

124.    Susan Weigert, Ph.D was in charge of UNH's grant from the National

Center and State Collaborative (NCSC) and sent the following email related

to her concern about Lisa Brady's claims of fraud:

> From:       Weigert, Susan  [mailto: Susan.Weigert@ed.gov]
> Sent:       Wednesday, October 01, 2014 7:42 AM
> To:         Rachel Quenemoen (quene003@umn.edu)
> Cc: Martha Thurlow (thurl001@umn.edu)
> Subject:    FW: Education Grant Fraud
>
> Rachel, what do you know about the claim, below, concerning
> facilitated communication? I supplied our Deputy Director, Ruth
> Ryder, with this film, **and would not want the department to appear
> to be endorsing something that was not at least a promising
> practice with some evidence.** Can you provide an opinion on
> whether the Habib clips we received actually depict 'facilitated
> communication', and whether you believe any of the claims
> suggested by the clip about ▮▮▮ might not be supportable?
> I would appreciate hearing from you today if possible so that we can
> take action quickly if need be.Thank you so much for your support
> in this Rachel.
> Susan
> Susan Weigert, Ph.D.
> U.S. Department of Education
> Office of Special Education Programs
> 550 12th Street S.W., room 4078
> Washington, D.C. 20202

125.The email showed that the individual in charge of Dan Habib's grant funded

film did not want to be associated with facilitated communication.

126. The following internal U.N.H. emails show that University Officials knew or

should have known that the Axel film was a fraud and taken steps to prevent the

continued exploitation and sale of the film.  On **October 6, 2014** UNH's Dan

Habib sent the following email to Assistant Professor Mary Shuh with regard to

Lisa Brady's allegations of fraud:

"From: Habib, Dan
Sent: Monday, October 06, 2014 9:09 PM
To: Schuh, Mary
Subject: Re: Education Grant Fraud
thanks Mary.  Honestly, at this point the most effective path (and the one
Michael and I took with NCSC and I the gist of my phone message to Son Park at
HSC) is that *the Axel film doesn't even mention FC.  FC is a gripe that she has
with the district, and that's her ax to grind. She's trying to use her presumption
of NO competence for Axel* (and I'm sure other kids) **and her hatred of FC to try
to undermine the film** – but I think it's bc she thinks she can get some national
attention this way.  I don't want to engage with her in an FC debate, that's
obviously a no win proposition with her. I'm just making it clear with folks that
this is about a conflict btw her and the district that she is trying to escalate – and
her claims of 'education grant fraud' has already been dismissed by Virginia
Barry.  And if you saw the NSCS email she wrote, her own lawyer is distancing
himself from her. A great coincidence is this FB post Keith Jones had today (see
attached image), totally unrelated but so connected to this discussion. So let's not
help her escalate this by making it a debate with her about FC.  I think her emails
are disjointed and hateful enough that they will basically die on the vine.  I may
just have to keep directly refuting her emails/clarifying the Axel film for a while,
but that is ok, I can manage that.  And I really don't think she has any credibility
with anyone at this point.  It's just a pain in the ass that I don't need, but I guess
it comes with the territory. Dan"

127.    The following email shows that Mary Schuh has no regard for how facilitated

communication harms students, and teachers that refuse to go along with using the

controversial method that is known to violate human rights. she encouraged Dan

Habib to produce his next fraudulent film.

| | |
|---|---|
| From: | Schuh, Mary |
| To: | Habib, Dan |
| Subject: | RE: Education Grant Fraud |
| Date: | Monday, October 06, 2014 8:57 PM |

73

Wow. **All the more important for you to create the next film.** I'm sorry this is happening. The reality is, is kids all over the state/country/world are being denied access to methods that support their intelligence because of their labels-and because they don't have good supports in their lives (like you and Betsy). I would hate to think that someone like Lisa Brady would have this much power. Has the group reached out to Doug and other like Christi Ashby for their input? If you just rely on ASHA and ISAAC voices this won't go anywhere positive. How can I help?
You need to connect with ▇▇▇▇▇▇  and daughter ▇▇▇▇▇ and learn how essential supported typing and having a voice is……..
The real victim is▇▇ and other people with labels like his who aren't provided with access to communication supports that allow true expression.


128. Within the next email Mary Shuh admitted knowing that Axel used FC

within the film. She also touched on legal advice she received about denying Lisa

Brady her right to free speech.  But for the unlawful fraudulent portrayal of Axel,

using public grant funds, Lisa Brady would still have her teaching job.


On **November 19, 2015** UNH IOD's Assistant Professor Mary Shuh sent the following email to Dan From: Mary Shuh <Mary,Schuh@unh.edu>
Date: Thursday, November 19, at 7:10 AM
To: Dan Habib dan.habib@unh.edu
Subject: RE: letter to the slate editor

Continuing the conversation-See my response
Thanks Dan. This input was exactly what I was hoping for and it is much cleaner and clearer. Three thoughts
   **I worry about stating that the Axel film does not portray FC-Axel used FC and while WE don't say anything about it, when people "in the know" review the film, they know it is FC**. What about this change in the text: The video "Axel" does not, as the article claims, focus on an approach called facilitated communication. (I changed 'portray an approach' to 'focus on an approach'). I think it's important to correct the impression that the film was somehow about FC.  We would specifically comment on the photo caption that said Michael was overseeing FC training and make it clear that Michael was doing no such thing-and say what he was actually doing. Michael would have to write that.
   Yes-this makes sense

Might there be some merit to exposing Lisa Brady's claims that she lost her position because of the film and linking her fighting her right for DNA testing and her original exploitation about losing her position? She didn't lose her job bc of the film, she lost her job, if I recall, for not correctly implementing an IEP (and being crazy of course) or something along those lines. Although Lisa Brady is mentioned in the article, and we know she's a big source of the background info, she's not a big part of the article. I don't think trying to discredit her in this letter is a good idea. This letter should just be about discrediting the reporting. I think we'll have more success with Brady if we can get UNH legal to go after her directly- I think the only chance of stopping her is getting some legal muscle pushing her back and make her concerned about UNH legal action.

**Legal advice I have received about cease and desist says "When you think things can't get worse, they always can and that cease and desist would escalate to a whole new set of accusations about us trying to limit her right to free speech etc…"**

Would it be worth mentioning that Aurbach is continuing to tweet inaccurate content from the article? Sure, if you can point to something specific that is inaccurate. **The CV thing was not necessarily inaccurate**, it was more about him trying to be sensational and foster speculation of a 'cover up.' The good news is that nobody is paying attention to his tweets except a few weird gamers, Perhaps it will slow down…

I just got off the phone with XXXXX who is beyond furious. She would like us to include a statement in our response about XXXX being misrepresented. She also spent a lot of time talking about how SWIFT has basically given her the message that SWIFT doesn't care about her kid or kids like XXXX


129.Mary Shuh's reference to **"people in the know,"** can reasonably be inferred

to mean, **people trained to spot the use of facilitated communication.** The

reference to CV (above) within Shuh's email (clairvoyance) was from the Slate

Magazine interview with David Auerbach, and Shuh stated the following:

> **Auerbach:** Why do you utilize a very controversial and generally unproven approach?
> **Schuh:** *We're offering FC training because there's a huge demand for it.* Hundreds of people have been asking for evaluations that include it.
> **What if hundreds of people came demanding leeches as a treatment for autism?**

75

> **Schuh:** If a hundred people came here and demanded leech treatment, I think there'd be people here saying to take a look.
> **What if people came demanding astrological treatment for autism?**
> **Schuh:** Astrology? No, because we don't have anyone who has high-enough quality and training in order to deliver that.
> **There are FC practitioners and advocates who believe telepathy plays a role in FC. Do you believe telepathy is a part of facilitated communication?**
> **Schuh:** Telepathy? I have no comment on that. I couldn't say yes, I couldn't say no. It's not part of the practice of the method. It's a hard place for me to go to.** See:
> https://slate.com/technology/2015/11/facilitated-communication-pseudoscience-harms-people-with-disabilities.html

130. Dan Habib has not had to answer to anyone. The University of New Hampshire Institute on Disability does not have an appreciation for how their fraudulent depiction of Axel, cost Brady her livelihood. U.N.H. promoted a fraudulent film, and when people started to question them, they continued to turn a blind eye, and act with deliberate indifference to an obligation to self-police their violations of the law. Instead, they rallied their political favors, State Actors helping State Actors cover up a crime.  Dan Habib had no worries:

**From:** Habib, Dan  **Sent:** Monday, December 01, 2014 9:47 PM  **To:** Schuh,  Mary **Date**: Monday, December 01, 2014 9:47 PM

> *"She CCed the executive editor of the New York Times.  Oh boy, now we're really in trouble.  Sent from my iPhone."*

131. The following internal U.N.H. emails were exchanged between Charles Drum, then Director of the New Hampshire Institute on Disability (IOD), and U.N.H. Communication Professor/Expert, Stephen Calculator.

"**From**: Drum, Charles, **Sent**: Friday, November 20, 2015 3:10 PM. **To**:
Calculator, Stephen **Subject**: Assessment
**Hi, Steve**-Thank you for not responding to the Slate piece. I think this will give IOD the impetus to clarify our stance on FC and it has been a long time coming. Have you watched the Axel film? http://www.youtube.com/watch?v=hsES61i8i-Q Since FC is not my area, I'm trying to get a sense of whether it's reasonable to come to the conclusion from a lay person's perspective that FC is present in the film.  Would an expert conclude that there's FC in the film? The Slate article states: "Harvard's Howard Shane documented the tricks and deception for me in detail, concluding, 'They only made a few mistakes in editing, but the truth does come out." I see the occasional hand on wrist, but don't know what I should be looking for.  Any chance we can talk about this?  Thanks.

"**From**:     Calculator, Stephen **To**:  Drum, Charles **Subject**:   Re: Assessment
**Date**:     Sunday, November 22, 2015  12:01:30 PM
**Hi Charles**, Sure, I would be happy to discuss this with you, preferably after the Thanksgiving break. **In viewing the video I believe most individuals with knowledge of FC would identify its use in this segment.**  There are segments with peers as well as the SLP that show them providing support to enable him to isolate an index finger and point.  There are also buzz FC sentences and phrases about assuming competence, planning for college, "independent typing", etc.At one point, Axel is quoted saying something like, "I want to talk...to type." **To be honest, the first time I saw the video I questioned the sincerity of the production.  There are several shots of Axel typing/pointing where his hand is shown in isolation and we don't know whether or not he is being facilitated because, if so, the support is off-camera.** I hope this helps for now, Stephen N. Calculator, Ph.D. Professor  Department of Communication Sciences and Disorders Hewitt Hall, 4 Library Way Durham, NH 03824-3563 (603) 862-3836 stephen.calculator@unh.edu"

132.Somersworth School District also admitted to using FC in the film, in prior

court documents as stated:

"Defendants admit that prior to arriving at the Somersworth School District the Student's prior school had utilized Facilitated

Communication (FC) during his learning. The District was transitioning the student from FC to another form of communication. **Defendants admit that one small portion of the film included a depiction of educators working with the Student through Facilitated Communication.** Defendants do not agree with the overall characterizations of FC made by the Plaintiff but admit that it is not their preferred method of communication and that it has been criticized by some organizations including at least some of those referenced by the Plaintiff." See Lisa Marie Brady v. School Board, Somersworth School District, Civil Action No. 16-CV-00069-JD, May 23, 2016.

133. The N.H. Institute on Disability wrote and sent out a formalized statement to counter Lisa Brady's claims about the use of FC with Axel to make outrageous claims about his intellectual abilities in a public film.

| | | |
|---|---|---|
| From: | **Habib, Dan** | |
| | To: | **Gianino, Matthew; Drum, Charles** |
| | Cc: | Schuh, Mary; McSheehan, Michael |
| | Subject: | RE: NH DOE Corruption: A call the NH Senate to investigate |
| | Date: | Monday, July 06, 2015 11:16 AM |

I think we should send our letter out today to every NH entity on the list minus the media. FYI, the link at the bottom goes to a youtube interview with Sen. Kevin Avard. He gave Lisa Brady a platform on his show to talk about this as a 'whistleblower.'
dan
Dan Habib
Filmmaker and Project Director

134. Within the film, UNH's Michael McSheehan made a pitch about Axel's inclusion from a civil rights perspective while he publicly exploited him in a film... in direct violation of Axel's civil rights, using public funds.

78



Michael McSheehan See https://vimeo.com/666997 film paused at 14:49

**FC is not considered AAC. (Augmentative Alternative Communication)**

135. Matthew Gianino, former Director of Communications, knew or should have known when he sent out the following e-mail that UNH IOD was responsible for federal wire fraud, and that Brady was being truthful. The IOD also knew that their biggest communication expert on U.N.H. campus, Dr. Stephen Calculator had already informed them that: *"To be honest, the first time I saw the video I questioned the sincerity of the production." See paragraph 128 above.*

**From:** Gianino, Matthew [mailto:Matthew.Gianino@unh.edu]
**Sent:** Monday, December 07, 2015 3:35 PM
**To:** Drum, Charles
**Subject:** An important message from the IOD

On Wednesday, December 9, 2015 1:10 PM, "Gianino, Matthew"
<Matthew.Gianino@unh.edu> wrote:
"Greetings,
Since the fall of 2014, Lisa Brady, a former New Hampshire special education teacher, has made numerous allegations of fraud against the Institute on Disability (IOD) at the University of New Hampshire, specifically regarding the grant funded mini-film *Axel*. As a nationally recognized Center for Excellence in Disability and an organization with a well documented 28-year history of significant academic contributions to the field of disability, the IOD strongly denies these allegations.

79

**Ms. Brady's claims were also included in a complaint she filed with the NH Department of Education and after an investigation, it was determined that her complaint was unfounded.** Despite this and the fact that the film's funder remains supportive of the project and its outcomes, Lisa Brady continues to email hundreds of individuals and organizations including IOD partners, leadership and faculty at the University of New Hampshire, the New Hampshire Department of Education, the press, and national disability organizations.

*The IOD continues to deny any wrongdoing and fully supports the efforts of IOD staff* as they work to improve the knowledge, policies, and practices related to people with disabilities. The IOD is actively engaged with University of New Hampshire leadership to address this issue.  If you have any questions, please do not hesitate to contact me.

Sincerely,
Matt"

---

Matthew Gianino
Director of Communications
INSTITUTE ON DISABILITY / UCED
University of New Hampshire
10 West Edge Drive, Suite 101 | Durham, NH 03824
Phone: 603.862.2300 | Relay: 711 | Fax: 603.862.0555
matthew.gianino@unh.edu | www.iod.unh.edu

**136.** The University of New Hampshire Institute on Disability Staff; Dan Habib, Michael McSheehan, and Mary Schuh suppressed material evidence, and denied Brady's right to due process and free speech. They violated the law, N.H. Title LXII, **II, and 641:7, Falsifying Physical Evidence II**. They knowingly made and then published a film, that included false statements that are part of a governmental record. They turned a blind eye, and acted with deliberate indifference to a duty they had with oversight and monitoring compliance with the law. They acted individually and in concert, to cause Lisa Brady to be deprived of her First and Fourteenth Amendment Constitutional Rights. Dan

Habib, *Michael McSheehan, and Mary Schuh* acted in furtherance of a conspiracy, under color of state law, to constitutionally harm Brady. They did so to silence Brady and to aid and abet the fraud.

**NEW HAMPSHIRE JUSTICES** No. 1:21-cv-00614-PB.

137. **Jan. 2, 2018:** Original state complaint filed in Strafford Superior Court.

138. **Dec, 13th 2018:** Amended State complaint was filed. NH Dist. Ct. Doc No 1

139. **December 28, 2019:** The Somersworth School Defendants filed an objection to Plaintiff's motion to amend the complaint. See Ex.

140. **January 25, 2019:** The Somersworth Defendants filed a motion for summary judgement **based on the first complaint**. NH Sup. Court Ex .

141. **February 12, 2019:** Judge Howard **granted Lisa Brady's amended complaint**. It legally should have rendered the Defendant's summary motion, moot. They never addressed the changes to the complaint.

142. **December 12, 2019**: Judge Howard's delivered his omnibus order. He used the original complaint and not amended one to intentionally harm Lisa Brady.

143. **March 10, 2020** Judge Howard issued an order on Brady's motion to reconsider his omnibus order.

144. **March 17, 2020** Brady discovered Judge Howard's error and Motioned for Reconsideration based on his error. He had legal jurisdiction to correct his mistake. The motion stated in part:

> *"Plaintiff, Lisa Brady, files this motion to reconsider summary judgement under Superior Court General Principles Rule 1. Scope,*

*Purpose, Enforcement, Waiver and Substantial Rights (e) **A plain error that affects substantial rights** may be considered and corrected by the court of its own initiative or on the motion of any party.  Plain Error: Brady's amended complaint granted by this Court on February 12, 2019 supplanted the original complaint filed on January 2, 2018.  See Young v. City of Mount Ranier, 238 F.3d 567, 573 (4th Cir. 2001). **Because the Court's analysis and findings quoted the original complaint throughout the order, it unduly prejudiced the plaintiff."**  See page 20 within July 15, 2020 NH Sup. Ct. motion.*

145. Judge Howard had legal jurisdiction and a duty to correct his mistake. When Judge Howard refused to correct an error that egregiously prejudiced Lisa Brady, he showed a willful intent to tampered with legal court records, a class B felony. He entered false facts that he asserted as truthful on public records.  His actions were calculated with the intent to constitutionally harm Lisa Brady, and in furtherance of a conspiracy to violate Lisa Brady's First and Fourteenth Amendment rights. His actions aided and abetted the ongoing wire fraud with Dan Habib's film.

146. **May 31, 2020** Lisa Brady filed her mandatory appeal to the New Hampshire Supreme Court. Case: 2020-0274  Lisa M Brady V. Somersworth School District, School Board,SAU#56, et al.

147. **On July 21, 2020**. The N.H. Supreme Court denied the appeal.

*"The superior court denied Lisa Brady's motion to reconsider the court's December 12, 2019 order on March 10, 2020. The motion to reconsider that she filed on March 17, 2020, was a successive-post decision motion that did not stay the running of the appeal period. Consequently, the appeal should have been filed on or before April 9, 2020. The notice of appeal was filed on June 1, 2020, and thus is untimely filed."*

148. **On July 22, 2020** Brady filed a motion to reconsider and argued:

In the State v. Ortiz, No. 2010–269 (October 27, 2011), the N.H. Supreme Court detailed the following condition for considering an appeal under the "plain error rule:"

*"The plain error rule" See State v. Russell, 159 N.H. 475, 489, 986 A.2d 515 (2009). "A plain error that affects substantial rights may be considered even though it was not brought to the attention of the trial court or the supreme court." Sup.Ct. R. 16–A. "However, the rule should be used sparingly, its use limited to those circumstances in which a miscarriage of justice would otherwise result." Russell, 159 N.H. at 489, 986 A.2d 515 (quotation omitted). To find plain error: "(1) there must be an error; (2) the error must be plain; (3) the error must affect substantial rights; and (4) the error must seriously affect the fairness, integrity or public reputation of judicial proceedings." Id. (quotation omitted). We have looked to federal plain error analysis for guidance in applying our plain error rule. Id. at 489– 90, 986 A.2d 515."*

Strafford Superior Court Judge, Mark Howard, committed a "plain error" and that error impacted Brady's rights to due process under Part I, article 14 of the N.H. State Constitution, when he erroneously granted the Defendants' motion for summary judgment and then refused to correct the errors, under superior court rule 1, within a second motion filed by the Plaintiff.  The Judge unduly prejudiced Brady when he granted the Defendants summary judgment based solely on the original "nullified" complaint filed with the Court on January 2, 2018 and not the "actual" amended complaint filed on December 18, 2018 and granted by the Court on February 12, 2019. The Supreme Court decision to dismiss Brady's suit will seriously affect the public reputation of the N.H. Court system after Brady publishes her book about a pro se' whistle-blower teacher, her long up-hill battle, and failed efforts to secure justice despite having written a prima facie complaint and despite all the evidence willfully ignored by the court.  The truth will make the Court look complicit with fraud and the exploitation of Brady's former special needs student, at the heart of this case.

149. **On August 18, 2020** the N.H. Supreme Court Justices held:

*"We have reviewed the claims made in Lisa Brady's motion for reconsideration and conclude that no points of law or fact were overlooked or misapprehended in the decision dismissing this appeal as untimely filed.  Accordingly, upon reconsideration, we affirm the July 21, 2020 decision and deny the relief requested in the motion."*

150.The N.H. Supreme Court Justices Hicks, Bassettt, Hantz Marconi, and

Donovan engaged in acts in furtherance of a conspiracy by denying Lisa Brady's

meritorious mandatory appeal based on legal findings that conflict with the law and prior legal precedent. As a Court of superintendent authority over Strafford Superior Court, the Justices of the Supreme Court are vicariously liable for the unlawful acts of Judge Mark E. Howard. They knew or should have known that Judge Howard was acting under color of state law in violation of Lisa Brady's 14th U.S. Constitutional right to equal protection of due process and granted Brady's mandatory appeal. They knew or should have known that Brady was entitled to an appeal, and that Judge Howard committed a reversible error and that he had both discretion and a legal obligation to correct the record.

151. The N.H. Supreme Court Justices have not disciplined or used its' superintendence authority (N.H. Chapter 490:4) over Defendant Judge, Mark E. Howard, for his negligent and willful and wanton violations of Plaintiff's constitutional rights under color of state law. Therefore, they have implicitly approved, ratified, or adopted Judge Howard's negligent unconstitutional actions, The acts and omissions of the New Hampshire Supreme Court Defendants; Hicks, Bassett, Hantz Marconi, and Donovan, were so culpable as to constitute authorization of, and acquiescence in, the unlawful conduct of Judge Mark E. Howard. Brady has continued to suffer irreparable harm as described above, and emotional distress undertaken intentionally with willful indifference.

152. On **July 22, 2021**:  Directly related to the conspiracy described within this complaint, Lisa Brady filed a federal *42 U.S. Code § 1983 &1985* [Case No. 21-cv-614-PB] complaint with the United States District Court of New Hampshire

against **Judge Mark E. Howard** of NH Strafford Superior Court, **Justice Gary E. Hicks,** Senior Associate Supreme Court Justice, **Justice James P. Bassett,** N.H. Supreme Court Associate **Justice Anna Barbara Hantz Marconi** of the N.H. Supreme Court, and **Justice Patrick E. Donovan**. [Opinion No. 2022 DNH 006]. Judge Paul Barbadoro dismissed Brady's complaint on January 7, 2022, and claimed that *the Rooker-Feldman Doctrine prevented his legal jurisdiction*. However; Rooker-*Feldman* was inapplicable to Brady's 1983 Conspiracy charges involving the New Hampshire judges. The state of New Hampshire has NEVER ruled on ANY conspiracy charges, and Brady's complaint was not "*futile;*" as evidenced herein.

153.**On January 17, 2022** Lisa Brady filed a motion to amend her complaint, under Title 42 of the United States Code and Section §1983, and alter or amend Judgment under 15(a)(2) and 59(e) of the Federal Rules of Civil Procedure to permit the Plaintiff to amend her complaint. She argued, in part, the following (case 1:21-cv-00614-PB, doc. 10):

" The U.S. Supreme Court, in Foman v. Davis, set precedential case law for allowing *pro se' litigants the opportunity to amend their complaint for "any apparent or declared reason"* such as undue delay, prejudice, *or futility,* plaintiffs should be given leave to amend their complaints." 371 U.S. 178, 182 (1962). *Pro se' litigants are entitled to "meaningful access" to courts,* it is a "fundamental constitutional right." Bounds v. Smith, 430 U.S. 817, 828 (1977)."

She also requested to include additional state actors as follows:

"The Plaintiff would also request that she be allowed to include additional State actors within her suit; The Institute on Disability, President of U.N.H., Dan Habib, Michael McSheehan, and the New Hampshire Commissioner of Education." (case 1:21-cv-00614-PB, doc. 10)

85

154. Judge Barbadoro endorsed his order on **January 18, 2022,** claiming an amended complaint would be "futile, "despite the fact that conspiracy charges against the judge dependents under Title 42 Section §1983, were not futile, and never lodged in any New Hampshire state court.

155. **January 20, 2022:** Plaintiff Lisa Brady filed an Appeal (No. 22-1060) with the US First Circuit Court of Appeals.

156. On **January 22, 2022** Lisa Brady filed a motion for a different circuit venue because *Defendant Judge Mark Howard's brother, Jeffery Howard, was Chief Justice of the First Circuit Court.*

157. **On March 30, 2022** Lisa Brady filed her appeal brief with the First Circuit.

158. Under federal law, 42 U.S.C. § 1983, claims accrue "*when all of the acts comprising the specific constitutional violation have been completed,*" and the plaintiff "knows, or should know" of the injury and its causal connection to the defendant. See Ouellette v. Beaupre, <u>977 F.3d 127, 135-36</u> (1st Cir. 2020). New Hampshire, under RSA 508:4, has a three-year filing deadline. Even though the judge defendants are not listed within this conspiracy complaint. Their actions are directly related to this case, and they played a pivotal final role in the conspiracy.

**CONSPIRACY STATUTE OF LIMITATIONS**

159. **August 18, 2020:** the NH Supreme Court: (Case No. 2020-0274) Denied Lisa M. Brady's motion for reconsideration with regard to Judge Mark E. Howard's <u>violation of the law</u> when he summarily dismissed Lisa Brady's Strafford

Superior Court complaint against the Somersworth School District Civil No. 219-2018-cv-00002.

**160.** The LAST Known event filed with N.H. Supreme Court regard occurred on July 27, 2021. Petition for Mandamus, Case No. 2021-0136. Though there are mandamus filings that do extend to later dates which; are relevant for determine statutory deadlines for filing.

**161.** The First Circuit Court of Appeals knows or should know that withholding Lisa Brady's appeal will continue to make this case stale, and deny Lisa Brady the opportunity to file a consolidated conspiracy claim under 42 U.S.C. § 1983.

**CONSPIRACY CASE LAW**

**162.** "The existence of a conspiracy may be shown circumstantially, 'by inferences drawn from the nature of the acts complained of, **the individual and collective interests of the alleged conspirators,** the situation and relations of the parties, their motives and all surrounding circumstances preceding and attending the culmination of the common design.'" Daugherty v. Kessler, 264 Md. 281, 292 (1972).

163. "In most cases it would be practically impossible to prove a conspiracy by means of direct evidence alone." Windesheim v. Larocca, 443 Md. 312, 347 (2015).

**SUMMARY OF JUDGE HOWARD'S CRIMINAL ACT:**

164. **December 12, 2019**: The chart below compares Judge Howard's omnibus order in column one with the original "void complaint" in column two ***and the amended complaint <u>which he did not address</u>*** in column three. Judge Howard violated Title LXII Criminal Code, Chapter 641:3 Falsification in Official Matters. See Exhibit # 11 (p. 145) for <u>original complaint </u>filed; See Exhibit#12 (p. 158) for <u>Amended Complaint</u> filed; See Exhibit #13 (p. 168) Judge Howard's <u>order granting amended complaint</u>; See Exhibit #15 (p. 180) Judge Howard's <u>order</u>

granting Somersworth School District Summary Judgment.  Once Brady's

amended complaint was granted, Judge Howard had no legal authority to use it

to grant summary judgment. See summary of evidence that proves Judge

Howard intentionally entry of false facts in a legal record.

| Comparison of Judge Howard's Order with Original and Amended Complaint | | |
|---|---|---|
| **Omnibus Order** 12/12/19 NH District  Ct. Com Ex#14 | **Original Complaint** 1/2/18 NH Dist Ct. Com Ex #11 | **Amended Complaint** 12/13/18 NH District Ct, Ex#12 |
| Breach of Contract "Brady claims that the Somersworth School District breached its contract with her by terminating her "Based on a decision that Brady violated state DNA laws (NH RSA 141-H:2) . . . without legal justification or "Just cause" to make that determination." NH Dist Ct.Doc. Ex | Breach of Contract On January 20, 2015, the Somersworth School District breached Lisa Brady's teaching contract with willful and wanton negligence when they terminated her employment based on a decision that Brady violated state DNA laws (NH RSA 141 H:2).  They did so without legal jurisdiction or "just cause" to make that determination. NH Dist Ct. Doc. Ex | Breach of Contract 63 "The Board determined that Brady Violated NH RSA 141 H:2 without a complaining witness and knowing that no court of legal jurisdiction had ever found that she violated the law. They also failed to consider school board policy which; included exceptions to FERPA when they determined Brady violated student privacy."  NH Dist Ct. Doc. Ex |
| **Tort Claims** "With regard to her claim of misrepresentation, she asserts that the school district misrepresented its authority to prosecute her for a violation of RSA141-H:2 and that she relied on that representation in preparing her defense at the termination hearing." NH Dist. Ct. Doc.1  Ex No 1 | **Tort Claims** Somersworth School District misrepresented an issue of material fact to the plaintiff, knowing it was false: The Somersworth School District misrepresented their authority to determine if Lisa Brady violated state law when they used a school board hearing, without | **Tort Claims** 66. "Somersworth School District misrepresented an issue of material fact to the plaintiff, knowing it was false and denied her 'fair' due process Somersworth School District used a school board hearing with deceitful intent when they knowingly misrepresented the truth |

| | | |
|---|---|---|
| p. | legal jurisdiction, to determine that Brady violated NH State Laws for DNA testing (NH RSA: 141 H:2).   NH Dist Ct. Doc. Ex  p. | and terminated Brady's employment based on a decision that she violated state DNA laws (NH RSA 141 H:2) and based on a decision that she was "immoral," "abandoned her position," and "violated student privacy."  They did so without "just cause" to make that determination. NH Dist Ct Doc.1 Ex p. |
| **NEGLIGENCE:** "With regard to her negligence claims, she asserts that the school district and the individual defendants knew or should have known that they did not have the authority or jurisdiction to prosecute a violation of the genetic testing law." NH Dist. Ct. Doc.1 Doc1 Ex 15 P.174 | **NEGLIGENCE:** "[T]hat Somersworth School District's negligence foreseeably injured plaintiff in that defendant knew or should have known that Brady would be forced to rely on the Somersworth School District's claim of authority to "prosecute" Brady for violations of State Law NH RSA 141 H:2 in a hearing conducted by Somersworth School District and did, in fact, result in Brady's termination. The Somersworth School District knew or should have known that they did not have legal jurisdiction to prosecute Brady for violations of DNA laws. The defendant's negligence was a proximate cause of the | **NEGLIGENCE:** 71. "[T]hat Somersworth School District's negligence foreseeably injured plaintiff in that defendants knew or should have known that there was no material evidence or complaining witness to support a conclusion that Brady violated DNA laws and that they were required to consider school district policy on FERPA exceptions and they did not, when they determined that Brady violated student privacy. The defendant's negligence was a proximate cause of the harm to plaintiff, who is entitled to recovery." NH Dist  Ct. Doc.1 Ex  p. |

89

| | harm to plaintiff, who is entitled to recovery.  NH Dist Ct. Doc.1 Ex 5 p.33 | |
|---|---|---|
| "Brady also asserts that the individual defendants interfered with her employment when they "brought charges" against her for violating the genetic testing statute. Once again, Brady misapprehends the issue. The individual defendants did not bring any charges against her for a violation of the statute. She was given proper notice that her conduct may have violated state law and that she could be terminated for her conduct, as well as for several other reasons. There is no evidence that the individual defendants' role in initiating termination proceedings was in any way improper. Accordingly, they are entitled to summary judgment on this count. NH Dist Ct. Doc.1 Ex 15 P.174" | "Defendant's Jeni Mosca and Pam MacDonald negligence foreseeably injured Lisa Brady in that they knew or should have known that they did not have authority to bring charges against Brady for violating NH DNA laws before the Somersworth School Board. Mosca and MacDonald knew or should have known that Brady had never been found guilty of violating that law in any court of legal jurisdiction and that no staff member within the Somersworth School District accused Brady of violating their DNA rights. Mosca and MacDonald should have known that if they had "legitimate" "nonretaliatory" concerns about Brady violating DNA laws, that they had a duty to forward their accusations to the proper "legal authorities." NH Dist Ct.Doc.1 Ex 5 p.34 | "76. Defendant's Jeni Mosca and Pam MacDonald's negligence foreseeably injured Lisa Brady in that they knew or should have known that the DNA charges brought against Brady were unfounded and that they did not have "just cause" to bring them to the Board. They also knowingly brought charges against Brady in "bad faith" for "immorality," "abandoned her position," and violating student privacy.  They did so without "just cause" to bring those charges and with foreseeable negligence." NH Dist Ct.Doc.1 Ex  p. |

| | | |
|---|---|---|
| **Intentionally interfered with contractual relationship** "Brady also asserts that the individual defendants interfered with her employment when they "brought charges" against her for violating the genetic testing statute. Once again, Brady misapprehends the issue. The individual defendants did not bring any charges against her for a violation of the statute. She was given proper notice that her conduct may have violated state law and that she could be terminated for her conduct, as well as for several other reasons. There is no evidence that the individual defendants' role in initiating termination proceedings was in any way improper. Accordingly, they improper. Accordingly, they are entitled to summary judgment on this count. NH Dist Ct. Doc.1 Ex 15 P.174 | **Intentionally interfered with contractual relationship** "Defendants Pam MacDonald, Jeni Mosca, and Attorney Jeanne Kincaid, in their individual and professional capacities, improperly and intentionally interfered with contractual relationship between Brady & and the Somersworth School District when they brought charges against Brady for violating NH RSA 141 H:2 and knew or should have known that no court of legal jurisdiction had ever found that Brady violated that law and knew or should have known that no employee in theSomersworth School District had ever accused Brady of violating their DNA rights.   NH Dist Ct.Doc.1 Ex 5 p.35 | **Intentionally interfered with contractual relationship** 79. "Defendants Pam MacDonald and Jeni Mosca, in their individual and professional capacities, improperly and intentionally interfered with contractual relationship between Brady & and the Somersworth School District after Brady filed civil rights and criminal complaints against them which; were directly related to violations they committed against her special needs student. All charges brought before the Board by Mosca and MacDonald in support of terminating Brady were made in 'bad faith," false and misleading."  NH Dist Ct.Com Ex 6 |
| **DEFAMATION:** "With regard to Brady's defamation claim against the individual defendants, she makes no | **DEFAMATION:**  On February 16, 2015 Attorney Jeanne Kincaid, in her individual and professional capacities | DEFAMATION: 86. "The Somersworth School District/Board, Jeni Mosca, and Pam |

| allegation that the individual defendants made any statements against her that were defamatory. Instead, she argues that the school district's attorney made defamatory statements and that the individual defendants promoted and facilitated the attorney's defamatory statements. Assuming that accomplice to defamation is a cognizable claim under New Hampshire law, Brady has offered no evidence that the individual defendants promoted or facilitated any statement by the district's attorney. Accordingly, the individual defendants are entitled to summary judgment on this count." NH Dist Ct Doc.1 Ex15 p.174 | knowingly, willfully, and wantonly communicated orally (slander) on local television in Somersworth New Hampshire, information that she knew was false.  The oral testimony was directly related to assuring the public that Somersworth School Board had "legitimately" determined that Plaintiff, Lisa Brady violated a state law (NH RSA 141 H:2).  [Ex 170]  NH Dist Ct.Doc.1 Ex 5 p.36 | MacDonald knew or should have known that in releasing Kincaid's oral and written testimony to the public, it would expose Brady to public hate, contempt, ridicule, and being shunned by the teaching profession, interfering with employment prospects." NH Dist Ct. Doc.1 Ex 6 p. 59 |
|---|---|---|

165. Judge Howard's also used a void court document as a basis to deny Brady a

timely filed evidentiary hearing to refute summary judgment, and to deny a

motion to compel discovery. His order stated:

"Plaintiff's Motion to Compel Discovery is denied as moot. Motion to Amend Damages and Motion for Evidentiary Hearing. Denied as moot.

166. Judge Howard's omnibus order claimed Brady "pointed to no evidence," in

the same order that **he refused to sanction the school district for failing to**

**exchange, even one, written request for discovery**. Just three examples of his

comments included NH Dist Ct.Doc.1 Ex15 P.174-176:

☐    "There is no evidence that the individual defendants' role in initiating termination proceedings was in any way improper. Accordingly, they are entitled to summary judgment on this count."  ☐    "There is no evidence in the record to suggest that the school district engaged in any bad faith, malice or retaliatory conduct. Accordingly, summary judgment is granted in favor of the defendants on this count."
☐    "Brady points to no evidence that her termination was even related to her complaint, much less in retaliation for it.
167."If not for Judge Howard's purposeful criminal act, Lisa Brady's prima facie

writ would have already been processed in Strafford Superior Court. Judge

Howard's error prejudiced Brady and denied her the right to have her prima

facie amended writ proceed to jury trial, in violation of the 5th and 14th

amendment of the U.S. Constitution and Part I, article 14 of the N.H.

Constitution."

168.**On April 4, 2022** the New Hampshire Appellee State Judges replied to

Brady's complaint.

169.**On April 8, 2022** Lisa Brady replied to the Judges brief.  Within that reply

brief, she highlighted:

"Ms. Brady was denied even the most basic exchanges of discovery in the state of New Hampshire. Judge Howard *used a document without legal effect* as the basis to deny Ms. Brady discovery and to deny her an evidentiary hearing. He ruled in favor of the Somersworth School District's motion for summary judgment using a court document without legal effect. He also denied her motion for partial summary judgement using a document that was legally moot. **He knowingly falsified public court records and committed a felony to deny Lisa Brady justice.** The evidence is a matter of court/public records."  Brady 1st Cir Complaint.

**170.On April 26, 2023** Lisa Brady contacted her designated First Circuit case manager, Christine, who indicated that the long wait was not unusual and that Brady may not hear back for over another year or longer.  Warehousing Lisa Brady's complaint denies her the opportunity to file *conspiracy claims against all Defendants as a single action.*   She intends to petition NH District Court to consolidate case number Case No. 21-cv-614-PB with the case at bar.  "A district court can consolidate related cases under Federal Rule of Civil Procedure 42(a) sua sponte." See Devilin v. Transp. Commc'ns Int'l Union, 175 F.3d 121, 130 (2d Cir. 1999). Case No. 21-cv-614-PB

171. If the First Circuit Court rules in favor of Brady, she will be able to motion the district court to consolidate her cases. Brady's conspiracy claims against all Defendants should have been filed as a single action. She intends to petition to consolidate case number Case No. 21-cv-614-PB with the case at bar.

 "Courts often consolidate actions that they judge could or should have been filed as a single action in the first place.  See Ringwald v Harris675 F2d 768 (5th Cir 1982). The drafters adopted Rule 54(b) "in view of the wide scope and possible content of the newly created 'civil action' in order to avoid the possible injustice of a delay in judgment of a distinctly separate claim to await adjudication of the entire case. 1946 Committee Notes, 5 FRD at 472."

## CLAIMS

### COUNT 1 Civil Conspiracy in Violation of 42 U.S.C. § 1983 (All Defendants)

172.Plaintiff incorporates by reference each and every allegation contained in the paragraphs above as if set forth fully herein.

173.Plaintiff brings this claim against all Defendants, who conspired with one another with the specific agreement to commit a tortious act, namely

collaborating to make false and defamatory statements about Lisa Brady, in retaliation for exercise of her protected First Amendment rights.

174. The Defendants have acted in concert to make defamatory statements about the Plaintiff. They acted in furtherance of a conspiracy to silence Brady so that they could continue to secret the fraud within the "Axel" film,

175. The Individual Defendants acted in concert to intentionally violate Brady's First Amendment rights, acting under color of state law, and resulting in adverse employment actions being taken against her. Namely, failing to investigate her concerns and complaints, denying her due process rights,  determining she violated New Hampshire RSA legal statutes without due process (arbitrarily and capriciously based on speculation), knowingly making or being responsible for making false public written and verbal statements about Brady, asserted as truth, issuing false and misleading written warnings, hiring an outside consultant to investigate and to report on Brady's actions without including Brady, issuing findings from hearings without material evidence, unlawful transfers,  title demotions without due process, assigning her to an un-open position, making her working conditions unbearable through threats, hostility, allowing unsafe working conditions, and establishing pretextual disciplinary actions, and terminating her employment

176. The Defendants' conspired to constitutionally harm Brady and defame her, caused damage to her reputation. Moreover, the Plaintiff has suffered from loss of economic resources; retirement and income lost because she could not pursue her teaching career. She also suffered emotional distress from being forced out a profession that brought her joy.

177. The Defendants intentional, deliberate indifference to foreseeable serious harm to Plaintiff's career, aspirations as a teacher/administrator, were purposeful. They were inflicted with malicious, arbitrary, capricious, reckless, wanton, and outrageous conduct.

178. Lisa Brady seeks a declaratory judgment that the Defendants' actions constitute an illegal civil conspiracy, and injunctive relief to end the conspiratorial actions by stopping the sale of the "Axel" film which; constitutes a federal wire fraud.

**COUNT 2– 42 U.S.C. § 1983 CONSPIRACY: FAILURE TO INTERVENE (All Defendants)**

179. Plaintiff incorporates by this reference, all the allegations contained in the preceding paragraphs inclusive, as though fully set forth herein.

180. The Defendants acted under color of state law and deprived Plaintiff of rights secured by the Constitution and laws of the United States, specifically the Equal Protection Clause of section one of the Fourteenth Amendment to the United States Constitution.

181. In the manner described above, during the constitutional violations described above, one or more of the Defendants stood by without intervening to prevent the misconduct.

182. As a result of the Defendants failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff has continued to suffer irreparable harm as described above, and emotional distress. These Defendants had a reasonable opportunity to prevent this harm but failed to do so.

183. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

184. The misconduct described in this Count was undertaken pursuant to the New Hampshire Supreme Courts official or unofficial practice

COUNT 3
**42 U.S.C. S 1983 – Conspiracy to Violate the First and Fourteenth Amendment to the United States Constitution – Retaliation for First Amendment Protected Activity (All Defendants')**

185. All paragraphs above are incorporated herein by this reference.

186. Lisa Brady's speech was protected by the he First Amendment to the United States
Constitution, as applied to the states, through the Due Process Clause of the Fourteenth Amendment.

187. The Defendants either caused the Plaintiff's constitutional injuries or subjected the Plaintiff to constitutional injuries because of their actions. Plaintiff's free speech, involved a matter of public concern, that directly related to the false light portrayal of her special education student in a film selling worldwide. The Defendants conspired to retaliate against the Plaintiff, to silence her, and denied

96

Plaintiff her 14 Amendment Constitutional Right to procedural due process, as stated more fully in the paragraphs above.

188. The Defendants did not have a constitutionally justifiable reason to injure Plaintiff.

189. The Defendant's acted intentionally and under the color of state law, they violated Plaintiff's rights under the First Amendment to the United States Constitution by punishing Plaintiff for her constitutionally protected speech, and 14th Amendment Right to constitutionally sound procedural due process.

190. As an actual and proximate result of the Defendants' conduct, the Plaintiff has been injured and has suffered damages. All defendants acted in furtherance of a conspiracy to silence and deny Plaintiff "fair" due process, to protect their interests and the interests of the State in promoting the "Axel" film, and coving up the false light violation against Brady's former student, "Axel," as described above in more detail.

191. The Defendants acted in concert, either expressed or implied, in furtherance of a conspiracy to deprive Lisa Brady of her clearly established constitutional rights, when they caused, or subjected Lisa Brady to be terminated from her employment, in conflict with protections guaranteed by the First and Fourteenth Amendments to the U.S. Constitution.

192. Each of the Defendants' acts of collusion and conspiracy proximately caused the damages alleged. They were done with a calculated indifference to rights and protections guaranteed by the constitution, and Brady seeks a declaratory judgment that the Individual Defendants' actions constituted an illegal civil conspiracy, in violations of her First and Fourteenth Amendment rights.

## CAUSE OF ACTION VIOLATION OF THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES UNDER 42 U.S.C. § 1983 (SUBSTANTIVE DUE PROCESS) (Against All Defendants)

193. All paragraphs above are incorporated herein by this reference.

194. The Defendants acted under color of state law, and violated Plaintiffs' substantive due process, and "liberty" rights, guaranteed by the Fourteenth Amendment to the U.S. Constitution. Brady was a tenured teacher, and all her professional evaluations were excellent. She was egregiously retaliated against, defamed, and unlawfully terminated after she reported her special education student's exploitation, and false light portrayal, at the hands of Somersworth and

UNH IOD staff. She was forced out of a career that she excelled at and was passionate about. She was publicly humiliated and her reputation was tarnished by the intentional false public statement about her character, asserted as truth. She also lost her ability to grow professionally in a career that she chose based on passion, and the joy that it brought to her life.  The Defendants had not right to destroy her teaching career.

195. The Defendants' unlawful actions, described above in more detail, resulted in the loss of Lisa Brady teaching career, and any retirement benefits. The Plaintiff reported her student's victimization in a public grant funded film, and the Defendants failed to intervene to stop an ongoing federal wire fraud punishable under 18 U.S.C. § 1343.  The Defendants' behavior is outrageous and rises to a level that shocks the conscience. Brady cannot find relief within the judicial system in the state of New Hampshire because state superior and New Hampshire Supreme Court supreme court justices are directly involved as co-conspirators, aiding and abetting the ongoing wire fraud.

196. Defendants Somersworth School District, the University of New Hampshire, Institute on Disability, and the New Hampshire Department of Education are liable because at all relevant times they were responsible for making and enforcing policies with respect to correcting Axel's false portrayal in a public film, investigating Lisa Brady's complaints, and refraining from defaming and libelous statements based on Lisa Brady blowing the whistle on the fraud. The Defendants who had everything to lose if the public found out about their involvement with fraud, were in charge of carrying out policy to ensure that Brady's constitutional rights to due process were not tainted with bias. Defendants at all times relevant were responsible for making and enforcing policies that ensured that they did not violate the substantive due process rights of individuals, and they failed to make and enforce such policies.

197. Defendants are liable because at all relevant times they were responsible for making and enforcing policies with respect to the actions of their personnel and for making and abiding by the law, as well as their authority to deprive individuals of their right to fair due process and the Defendants failed to do that. All of the Defendants conspired to end Lisa Brady's teaching career with deliberate indifference to the constitutional injuries they inflicted, and the harm their actions caused when they ended her teaching career,

198. As a direct and proximate result of Defendants' violations of the Fourteenth Amendment, the Plaintiff has suffered, and will continue to suffer damages in amount subject to proof, and Plaintiff is entitled to: injunctive and declaratory relief costs from Defendants, and monetary, compensatory, and punitive damages from the Defendants.

98

REQUEST FOR RELIEF (42 U.S.C. § 1983)

WHEREFORE, Lisa Brady prays that this Court enter judgment in her favor and against each of the Defendants and grant:

A. Declarative Judgement: that the Defendants' actions constitute an illegal civil conspiracy, in violations of her First and Fourteenth Amendment rights.

B. Injunctive relief to stop the sale of the "Axel" film which; constitutes a federal wire fraud.

C. Compensatory and punitive damages, including damages for loss of retirement, loss of career advancement, emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

D. Compensation for economic losses on all claims allowed by law;

E. Special damages in an amount to be determined at trial;

F. Punitive damages on all claims allowed by law;

G. Court fees and costs;

H. Pre- and post-judgment interest at the lawful rate; and

I. Any further relief that this Court deems just and proper, and any other appropriate relief at law and equity.

**JURY DEMAND**
Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Ms. Brady demands a trial by jury

Respectfully submitted, (Sworn Affidavit Attached)

_Lisa Brady_____, August 11, 2023
/s/ Lisa Brady, Pro se'
8 Constable Road
Durham, NH 03824 lisa.brady@comcast.net
603-292-5052

99

**CERTIFICATION OF SERVICE:**

- I certify that a copy of this complaint will be served by County Sheriff; incompliance with federal rules of Summons under Rule 4 of the Federal Rules of Civil Procedure.

_____, August 11, 2023
/s/ Lisa Brady, Pro Se'
8 Constable Road
Durham, NH 03824 lisa.brady@comcast.net
603-292-5052

## SWORN AFFIDAVIT SIGNED BEFORE
## A NEW HAMPSHIRE NOTARY

## The United States District Court of New Hampshire

**STATE OF**  New Hampshire

**COUNTY OF** Strafford

PERSONALLY, came and appeared before me, the undersigned Notary, the within named Lisa Brady, who is a resident of Strafford County, State of New Hampshire, and makes this her statement and Affidavit upon oath and affirmation.

I affirm under penalty of perjury under the laws of the State of New Hampshire, that I have read my: 42 U.S.C. § 1983 conspiracy complaint, submitted to the United States District Court of New Hampshire, and I know it is true of my own knowledge, except as to those things stated upon information and belief, and as to those I believe it to be true. DATED this the 4rd day of August, 2023 and extending to the date that the motion is filed with the Court.

_Lisa Brady_
Signature of Affiant

SWORN to subscribed before me, this __4__ day _August_ , 20 _23_

_Audrey D Mackenzie_
NOTARY PUBLIC

My Commission Expires:

AUDREY D. MACKENZIE
NOTARY PUBLIC
State of New Hampshire
My Commission Expires
May 3, 2028

